768 F.2d 373
 247 U.S.App.D.C. 256
 NORFOLK & WESTERN RAILWAY COMPANY, et al., Petitioners,
v.
UNITED STATES of America and Interstate Commerce Commission,
Respondents,
National Association of Recycling Industries, Inc. Aluminum
Association, Inc., Consolidated Rail Corporation,
Reynolds Metal Company, Fort Howard
Paper Company, Intervenors.
 No. 83-2296.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 6, 1984.
Decided July 19, 1985.
 
 Petition for Review of an Order of the Interstate Commerce commission.
 Michael Boudin, Washington, D.C., with whom Eugene D. Gulland, J. Michael Hemmer, Michael P. Richman, Washington, D.C., Howard D. Koontz, Chicago, Ill., Richard W. Kienle, Roanoke, Va., Stuart E. Vaughn, Chicago, Ill., Richard Weicher, Chicago, Ill., Shirley A. Brantingham, St. Paul, Minn., John Paylor, Cleveland, Ohio, Albert B. Russ, Jr., Jacksonville, Fla., and James L. Howe, III, Richmond, Va., were on brief, for petitioners. Harry N. Babcock, Cleveland, Ohio, and W. Donald Boe, Jr., Omaha, Neb., entered appearances for petitioners.
 Craig M. Keats, Atty., I.C.C., Washington, D.C., with whom John Broadley, Gen. Counsel, I.C.C., J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Henri F. Rush, Associate Gen. Counsel, I.C.C., John J. Powers, III and John P. Fonte, Attys., Dept. of Justice, Washington, D.C., were on brief, for respondents.
 
 
 1
 Edward L. Merrigan, Washington, D.C., for intervenor National Ass'n of Recycling Industries, Inc.
 
 
 2
 William L. Slover, C. Michael Loftus and John H. LeSeur, Washington, D.C., were on brief, for intervenor Fort Howard Paper Co.
 
 
 3
 Dickson R. Loos, Washington, D.C., for intervenor Aluminum Ass'n, Inc. Craig Goodrich, Washington, D.C., entered an appearance for intervenor.
 
 
 4
 John A. Daily, Philadelphia, Pa., was on intervenor Consolidated Rail Corporation's letter supporting petitioners.
 
 
 5
 Before GINSBURG, BORK and STARR, Circuit Judges.
 
 
 6
 Opinion for the Court filed by Circuit Judge BORK.
 
 
 7
 Dissenting opinion filed by Circuit Judge STARR.
 
 BORK, Circuit Judge:
 
 8
 Thirty-six railroads petition for review of an Interstate Commerce Commission order. The Commission decided that shippers may seek reductions and refunds of certain individual rail freight rates for recyclable products. In National Association of Recycling Industries, Inc. v. ICC, 660 F.2d 795 (D.C.Cir.1981) ("NARI III "), this court approved a territorial average basis for calculating refunds and reduced rates for recyclables under section 204(e) of the Staggers Rail Act of 1980, 49 U.S.C. Sec. 10731(e) (1982). The Commission has now moved beyond NARI III and has adopted a new method for determining rail freight rates for recyclables that will require petitioners to reduce further their current rates and to pay additional refunds. Ex parte No. 394, Cost Ratio for Recyclables--1980 Determination, decision served July 20, 1983 ("1983 Decision" ). Because this new method is inconsistent with our interpretation of section 204(e), we reverse the decision of the Commission.
 
 I.
 
 9
 This case is the latest of a series involving the ICC's efforts to deal with railroad rates for recyclable products. Concern for the environment caused Congress to direct the Commission to determine whether the railroad rate structure discriminated unreasonably against recyclable products. The Commission investigated and concluded that recyclables were being treated fairly. This decision was set aside because the Commission did not adequately explain whether the rate disparities between recycled and virgin commodities were justified. National Association of Recycling Industries, Inc. v. ICC, 585 F.2d 522 (D.C.Cir.1978), cert. denied, 440 U.S. 929, 99 S.Ct. 1266, 59 L.Ed.2d 485 (1979) ("NARI I "). The Commission conducted an additional investigation and concluded that the standard for maximum reasonable rates on recyclables should be set at 180% of variable costs.[1] This decision also was set aside because of an absence of evidentiary support for the standard and because of the absence of an explanation for the ratio which the Commission had selected. National Association of Recycling Industries, Inc. v. ICC, 627 F.2d 1328 (D.C.Cir.1980) ("NARI II "), modified sub nom. Consolidated Rail Corp. v. National Association of Recycling Industries, Inc., 449 U.S. 609, 101 S.Ct. 775, 66 L.Ed.2d 776 (1981).
 
 
 10
 Shortly after NARI II was decided, Congress enacted the Staggers Rail Act of 1980, Pub.L. No. 96-448, 94 Stat.1895 ("Staggers Act"). Section 204(e) of the Staggers Act instructed the Commission to reduce rail rates for recyclables to levels no higher than required to maintain adequate railroad revenues and preserve an economically sound transportation system. Disagreement soon developed, however, because of a seeming contradiction between the first and second sentences of section 204(e).[2] The first sentence appeared to contemplate immediate rate reductions for recyclables "within 90 days after the effective date" of the statute. The second sentence, however, contemplated the continuation of some rates above the statutory ratio.
 
 
 11
 In its initial decision construing section 204(e), the Commission relied on the second sentence of the statute and declined to order the railroads immediately to reduce rates on recyclables. Ex parte No. 394, Cost Ratio for Recyclables--1980 Determination, 364 I.C.C. 425, 426 (1980) ("1980 Decision "). The Commission thought Congress had not intended to require immediate rate reductions and that so long as the excessive rates were not further increased, inflation (by steadily increasing variable costs) would bring rates down to the statutory ratio. The Commission also concluded that the statutory ratio should be set initially at 146% of variable costs. At this level, the Commission believed the railroads would earn enough money to cover both their variable costs in moving recyclables and their fixed costs such as general overhead, plus a reasonable return on investment.
 
 
 12
 The National Association of Recycling Industries appealed the Commission's 1980 Decision, and once again we reversed the Commission. National Association of Recycling Industries, Inc. v. ICC, 660 F.2d 795 (D.C.Cir.1981) ("NARI III "). We held that the Commission had failed to give adequate weight to the first sentence of section 204(e) which requires immediate rate reductions. The court reconciled the apparent conflict between the first and second sentences of section 204(e) by concluding that the statute contemplates rate reductions on the basis of territorial averages.[3] Accordingly, we held that individual rates could either exceed or fall below the 146% level so long as territorial average rates equaled 146%. The opinion noted that historically the Commission had ordered rate reductions on a territorial average basis and concluded that so long as individual rates exceeding 146% were not further increased, inflation would eventually bring all rates down to the statutorily required level. NARI III therefore endorsed territorial averaging as the preferred method for achieving rate reductions because only that method was consistent with the conflicting demands of the first and second sentences of section 204(e).
 
 
 13
 On remand, the Commission adopted the territorial average rate reduction methodology and ordered the railroads to pay refunds for past overcharges. Ex parte No. 394, Cost Ratio for Recyclables--1980 Determination, 365 I.C.C. 304 (1981), modified, order served Nov. 27, 1981, aff'd sub nom. Baltimore & O.R.R. v. ICC, No. 82-1066 (D.C.Cir. June 9, 1982) (unpublished) ("1981 Decision "). The Commission rejected use of an individual rate reduction methodology--i.e., reduction of each individual rate above the 146% ratio--because "[a]s a practical matter, it would not be feasible to require the carriers to develop ratios for every individual movement." 1981 Decision, 365 I.C.C. at 307. In a single cryptic sentence, the Commission also stated that "should a shipper of nonferrous recyclables believe that his particular rate still exceeds the permissible level, he may file a complaint with the Commission." Id. This statement was not elaborated upon, did not concern an issue that had been briefed or argued, and was clearly not necessary to the result of the 1981 Decision.[4]
 
 
 14
 All of the petitioners complied with the 1981 Decision by making rate reductions and paying refunds pursuant to the territorial average rate reduction method. Although the Commission did not specifically state that it was requiring use of this method for payment of refunds, it is impossible to read the 1981 Decision as endorsing any other conclusion. In subsequent opinions released in 1982 and 1983, the Commission noted that the railroads were in full compliance with the 1981 Decision. Ex parte No. 394, Cost Ratio for Recyclables--1980 Determination, decision served Dec. 6, 1982 (unpublished); Ex parte No. 394, Cost Ratio for Recyclables--1980 Determination, decision served May 20, 1983 (unpublished). Subsequently, however, several shippers demanded reduction of certain individual rates remaining above the 146% ratio, even though territorial average rates were already at the 146% level.
 
 
 15
 The railroads petitioned the Commission for a declaratory order clarifying their obligations under section 204(e). The railroads claimed that under NARI III and the 1981 Decision individual rate reductions were not required by the statute so long as territorial average rate reductions had been made. The railroads also claimed that they would be deprived of adequate revenues if they further reduced some individual rates at a time when territorial average rates were already at or below 146%. Finally, the railroads claimed that further individual refunds, in addition to the territorial average refunds already paid, would force the railroads to pay refunds twice.
 
 
 16
 On July 20, 1983, the Commission issued the decision now under review. Ex parte No. 394, Cost Ratio for Recyclables--1980 Determination, decision served July 20, 1983 ("1983 Decision "). The Commission concluded that the railroads' present rates "comply with our earlier Ex Parte No. 394 orders and in the aggregate are at or below the 146-percent level." Id. at 5. Notwithstanding this compliance, the Commission stated that it would entertain complaint cases against individual rates that remained above the 146% level and would now require further rate reductions and refunds on an individual rate basis. The Commission concluded that this construction was permissible under NARI III because it saw
 
 
 17
 no indication whatsoever that the court's construction would preclude later individual adjustments with respect to rates that have been detected as being above (or below) the cap. The purpose of the averaging approach was simply to establish initial overall compliance. From the start, we contemplated individual adjustments in both directions that would maintain the overall level of compliance and in fact result in individual rates gravitating closer and closer to the 146-percent level.
 
 
 18
 Id. at 12.
 
 
 19
 The Commission also concluded that the railroads' alleged double refund problem was of their own making, because all railroads knew about the availability of individual complaints from the start. Nonetheless, to mitigate the problem, the Commission offered to permit the railroads to offset "windfall" refunds paid to particular shippers (under the territorial average method) against any further future refunds sought by those same particular shippers under the individual rate method. This concession reduces but does not eliminate the double refund problem because there is no guarantee that the new refunds will always be sought by the same shippers who also benefitted under the territorial average approach. The railroads claim the problem is severe since they have already "distributed millions of dollars in refunds under the 1981 Decision." Brief of the Petitioning Railroads at 28.
 
 II.
 
 20
 This petition presents two issues for review. First, the Commission maintains that the legal question now before us was actually presented, litigated, and decided at the time of the 1981 Decision. The Commission therefore insists that the railroads' present challenge is barred by the Hobbs Act and principles of res judicata. Second, in response to petitioners' claim that it acted arbitrarily and capriciously in ordering the railroads to reduce rates and pay refunds twice under section 204(e), the Commission contends that its current interpretation of the statute is both permissible and fully consistent with our construction of that section in NARI III.
 
 A.
 
 21
 This petition is not barred by the jurisdictional provisions of the Hobbs Act or by principles of res judicata.
 
 
 22
 In the proceedings that led up to the 1981 Decision, no one ever raised the question of whether shippers could obtain both territorial average rate reductions and a second round of reductions and refunds on an individual rate basis. The pleadings that led up to the 1981 Decision make no mention of this issue, and the Commission failed to mention the matter when it summarized the questions it was deciding at the beginning of its decision. 365 I.C.C. at 305. The question presented now was not argued to the Commission at the time of its 1981 Decision.
 
 
 23
 There can also be no doubt that in 1981 the Commission did not decide the question now presented. The Commission's argument that it did rests on a single, cryptic sentence in the 1981 Decision indicating that the Commission did not intend to preclude the filing of complaints addressed to individual rates. This sentence gave no indication as to what action might be taken on individual shipper complaints, the sentence was not implemented by any ordering paragraph, and it was not necessary to the result. Indeed, the sentence appears to have been added almost as an afterthought.
 
 
 24
 Our belief that the question now before us was not decided in 1981 (and can therefore be raised now) is strengthened by our conviction that that question would not have been ripe for review in 1981.[5] As of October 1981, no complaints had been filed by shippers seeking individual rate reductions, no orders had been entered requiring the making of such reductions, and there was no indication whether the Commission would order such reductions if they were requested. Accordingly, it seems quite likely that in 1981 a petition to review a single, unclear sentence would have been dismisssed as unripe. See, e.g., Baltimore Gas & Electric Co. v. ICC, 672 F.2d 146 (D.C.Cir.1982). Since the Commission barely concedes that the issue of future Commission refunds is ripe even now, see Joint Brief for the ICC and USA at 33 n. 29, it is difficult to see how it could have been ripe at the time of the 1981 Decision.
 
 
 25
 It follows that the present petition for review is not barred by the jurisdictional deadlines of the Hobbs Act or by principles of res judicata. The Act requires that petitions for review of ICC orders be filed within sixty days after their entry or after the denial of rehearing. 28 U.S.C. Sec. 2344 (1982). Since the issue presented was not resolved until the 1983 Decision and petitioners filed a timely appeal from that decision, the jurisdictional provisions of the Hobbs Act have been satisfied.
 
 
 26
 We also see no merit to the Commission's invocation of either the claim preclusion or the issue preclusion aspects of the doctrine of res judicata. Claim preclusion has at most limited application to ongoing rate orders. As the Supreme Court has noted, rate orders are generally not res judicata because "[e]very rate order made may be superseded by another." Tagg Bros. & Moorhead v. United States, 280 U.S. 420, 445, 50 S.Ct. 220, 226, 74 L.Ed. 524 (1930) (Brandeis, J.); see also United States v. Utah Construction Co., 384 U.S. 394, 421-22, 86 S.Ct. 1545, 1559-60, 16 L.Ed.2d 642 (1966). In any event, the 1981 Decision did not resolve the same claim as the one now advanced. Issue preclusion applies only to issues that were actually litigated, as well as decided, see, e.g., United States v. International Building Co., 345 U.S. 502, 504-05, 73 S.Ct. 807, 808, 97 L.Ed. 1182 (1953) (Douglas, J.); Association of Bituminous Contractors, Inc. v. Andrus, 581 F.2d 853, 860 (D.C.Cir.1978), and only to issues whose resolution was necessary to the judgment. Restatement (Second) of Judgments Sec. 27 comment h (1982). The individual complaint issue was not litigated prior to the 1981 Decision, and the resolution of that issue was not necessary to the decision.
 
 
 27
 Finally, the Commission objects that judicial review of this case is barred because petitioners have not satisfied the requirements which must be met prior to reopening of a final agency decision. 49 U.S.C. Sec. 10327(g) (1982). But since the 1981 Decision did not decide the issue decided in the 1983 Decision, there was no occasion for petitioners to resort to the statutory reopening procedures with respect to the former.
 
 B.
 
 28
 Turning to the merits, several factors cause us to favor the construction of section 204(e) advanced by petitioners. First, as we indicated in NARI III, it is generally desirable in construing statutes to give effect " 'if possible, to every word, clause and sentence of [the] statute' so that no part will be inoperative or superfluous, void or insignificant." NARI III, 660 F.2d at 799, quoting In re Surface Mining Regulation Litigation, 627 F.2d 1346 (D.C.Cir.1980). Petitioners' reading of section 204(e) ascribes a purpose to both the first and second sentences. The first sentence requires the immediate reduction of recyclable rates until territorial average rates are equal to or less than the statutory ratio. The second sentence, in turn, provides that individual rates that still exceed the average may not be further increased until inflation has brought them down to the statutorily prescribed level.
 
 
 29
 This interpretation explains why section 204(e) requires immediate rate reductions, while nevertheless contemplating the existence of rates that exceed the statutory level and may not be further increased. The Commission's reading on the other hand ascribes no purpose to the second sentence, since it implies that individual rates that exceed the statutory ratio, even temporarily, must necessarily be illegitimate.[6] Under the Commission's reading, it is difficult to understand why Congress allowed any rates to remain above the 146% level or why Congress believed it was necessary to prohibit further increases of rates that were already excessive. Under petitioners' theory, however, the purpose of the second sentence becomes clear: it ensures that inflation will eventually reduce all individual rates to the statutory level, even as the first sentence ensured an immediate reduction of territorial average rates to the 146% ratio.
 
 
 30
 This reading of section 204(e) is also more consistent with the interpretation adopted in NARI III. As explained there, the dissonance between the two sentences of section 204(e) is eliminated when one remembers that both the Commission and Congress have always appeared to contemplate territorial averaging when they have ordered rate reductions on recyclables in the past.[7] Territorial averaging was contemplated by the Commission in both NARI I and NARI II, which set an average revenue-to-variable cost ratio of 180%. Similarly, the Senate Report to section 204(e) contemplated the continued use of the Commission's territorial average method when it explained that the purpose of the new section was to reduce "the Commission's cap on recyclables from the 180 percent revenue/variable cost ratio level to the [new] ratio level established by [the statute]." S.Rep. No. 470, 96th Cong., 1st Sess. 34 (1979). See NARI III, 660 F.2d at 800 (quoting Senate language). We recognized in NARI III that territorial averaging has always been used in ordering rate reductions for recyclables, and we concluded that, in light of that historical practice, the first two sentences of section 204(e) were readily reconciled. NARI III, 660 F.2d at 799. Our conclusion in NARI III is very similar to the construction of section 204(e) urged on us by petitioners, and indeed we believe petitioners have given NARI III its ordinary reading.
 
 
 31
 Nonetheless, the Commission objects that its notion of two-stage implementation and of individual rates gravitating closer and closer to the 146% level is not precluded by NARI III. We agree with the Commission that NARI III does not specifically preclude this construction. Nonetheless, we believe that the most plausible reading of NARI III is that it endorsed territorial averaging as it had been practiced up to that time in NARI I and NARI II. We see no reason to believe that the NARI III court envisioned the novel method of second stage individual rate reductions subsequently devised by the Commission.
 
 
 32
 In truth, this new method of combined territorial average and individual rate reductions represents a break with the Commission's practice as described in NARI III and the 1981 Decision. The unfairness of this break is patent. In the two decisions mentioned, the railroads were instructed that territorial average rate reductions and refunds were an acceptable method for complying fully with the requirements of section 204(e). In reliance on those decisions, petitioners distributed millions of dollars of refunds and adjusted their rates until they achieved full compliance with the 146% ratio on a territorial average basis. Now, however, the Commission is no longer satisfied with this initial interpretation of section 204(e). Instead, it proposes a new interpretation which will require the railroads to pay at least some double refunds.
 
 
 33
 Were we to accept the Commission's conclusion that section 204(e) allows individualized rate reductions, we believe we would also have to conclude that the section's revenue adequacy requirement[8] mandated individualized assessment, in those cases, of the revenue-to-variable cost ratio.[9] Because nothing in the language or legislative history of section 204(e) suggests that Congress intended to create such a complicated system of individualized assessments, we believe it more likely that Congress intended the Commission to follow its traditional practice. Congress legislated against a backdrop of understood practice in this case, and it would be surprising if a significant departure from that practice was intended but was nowhere discussed.
 
 
 34
 We are aware, of course, that the Commission believes that its 1981 Decision contemplated the use of both territorial average and individualized rate reductions. We do not believe, however, that petitioners were fairly put on notice of this by the single cryptic sentence on which the Commission so heavily relies. Anyone reading the 1981 Decision in light of NARI III is left with the clear impression that he will have satisfied the requirements of the law by paying refunds (and making rate reductions) on a territorial average basis. If the Commission intended to convey some other meaning, it should have relayed its instructions more clearly and in greater detail. The Commission has known for several years that the railroads were attempting to comply with section 204(e) according to the territorial average method. It is now very late in the day for the Commission to decide that that method is inadequate.
 
 
 35
 In the present case, petitioners have fully complied with the prior holdings in NARI III and in the 1981 Decision as they would be commonly understood. Under these circumstances, it is appropriate that we should hesitate before adopting any new construction of section 204(e) that will impose large new burdens on petitioners. The railroads have legitimately relied on a construction of the statute that we think the most plausible. Accordingly, we reverse the Commission's 1983 Decision to the extent that it authorizes reductions or refunds with respect to rates already in compliance with section 204(e) on a territorial average basis.
 
 
 36
 It is so ordered.
 
 STARR, Circuit Judge, dissenting:
 
 37
 I respectfully dissent. In my view, the Commission reasonably decided that the best way to implement congressional intent, as embodied in section 204(e) of the Staggers Act, was to allow for individual complaints by shippers and refunds for charges that exceeded the 146% average level. The agency's interpretation, moreover, contradicts neither the Staggers Act nor any court decision, while at the same time fully effectuating Congress' clear intent. For that reason, I would uphold the order in question here.
 
 
 38
 The object of the recyclables portion of the Staggers Act was, of course, to "insure reasonable and nondiscriminatory rate levels on [recyclable] commodities by statutory proscription." S.REP. NO. 470, 96th Cong., 1st Sess. 34 (1979). This court in NARI III held that Congress' intent in this respect could be satisfied if the ICC required the railroads to have average rates of 146% of variable costs. But Congress' goal would obviously be better achieved under the ICC's approach than under NARI III's minimal standards. If only average rates are used, then railroads could lawfully charge many shippers rates for recyclables far above the 146% level; this of course constitutes a clear disincentive to the rail shipment of recyclables subject to such high rates. On the other hand, if individual complaints are permitted, then no recyclable materials would be shipped at a rate higher than 146% of variable costs, at least not without the potential for resort to the Commission for a fully efficacious remedy. Admittedly, this regime, as contemplated by the Commission, will result in the railroads' receiving less than 146% of variable costs for their total shipments of recyclables; however, as this court stated in NARI III:
 
 
 39
 While it is true that [the Staggers Act's] overall purpose is to provide the opportunity for railroads to obtain adequate earnings, it is equally true that section 204 requires the Commission to enforce its requirement "notwithstanding any other provision of this title or any other law...." Congress deliberately chose to single out recyclable or recycled materials, other than iron or steel, for special treatment and thereby created a specific exemption from the general purposes of the Act.
 
 
 40
 660 F.2d at 799. What is equally important, section 204(e) does not prohibit rates below the 146% level; to the contrary, the provision states that the rates shall be "equal to or less than" the 146% level. Thus, the prime concern of section 204(e) is to provide incentives for increased recycling; the ICC's approach reasonably achieves that goal, in a manner superior to a pure average-rate approach.
 
 
 41
 Indeed, I think even the railroads would admit that Congress did not appear to have an intent as to whether only average rates, or some other rate methodology, should be employed. Under elementary principles, adequately obvious so as to require little elaboration, when Congress does not express an intent, the court's sole duty is to determine whether the agency's action in the context of its mission is reasonable; if so, then the agency's view must be upheld. Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., --- U.S. ----, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984).
 
 
 42
 The Commission's approach, moreover, would scarcely sound any financial-havoc alarm for the railroads. One of their own number, Conrail, has taken steps on its own initiative which achieves that which the ICC's order invalidated here today would have accomplished. That is to say, if the railroads rued the notion of operating under an ICC-mandated regime of average rates plus individualized reductions, the carriers could elect, with no interference from Washington, to set rates on an individual level, just as Conrail did. Either the Conrail method or the ICC method would better effectuate Congress' intent than the average-rate method that the court today in effect imposes on the Commission, to the clear detriment of encouraging rail shipment of recyclables. In addition, the problem--which is concededly a real one--of the railroads actually receiving less than 146% of variable costs would likely be only of temporary duration. Once the railroads were required to pay a refund for any rate set above the 146% level, the clear incentive would be provided for the carriers, if acting rationally (as we must assume they would) to set more and more of their rates for recyclables on an individual basis; at the end of the day all railroads would likely choose to set all their rates on an individual basis, again, just as Conrail has done.
 
 
 43
 Since the court can point to nothing explicit in section 204(e) or NARI III to support its decision scuttling the agency's order, the court seeks to justify its ruling through inference-drawing. But with all respect, none of the inferences seem to me valid, much less decisive. First, the court states that its interpretation gives meaning to the second sentence of section 204(e), while the ICC's reading "ascribes no purpose to the second sentence." Op. at 379. However, the ICC's interpretation does give meaning to the second sentence in two respects. First, the provision has meaning if one reads section 204(e) as giving the Commission several options as to how to achieve Congress' goal. One of those options would be to set rates on an average basis only. If the Commission selected that option, then the second sentence of section 204(e) ensures that no increase will occur in individual rates that are equal to or above the 146% level. On the other hand, if the ICC chose the option of setting all rates individually, or setting rates on an average basis but allowing individual reductions, then the second sentence will not have to come into operation. Under this approach, the second sentence is not meaningless, but rather comes into play if the ICC chooses one of several options that are open to it. Indeed, the court's argument against the ICC's interpretation would apply with equal force to a rule by the ICC that, in the future, all rates are to be set on an individualized basis. Yet, it is inconceivable that Congress meant to proscribe a system that assured every recyclable shipment would be at 146% of variable costs.
 
 
 44
 In addition to the foregoing, the second sentence of section 204(e) could actually come into operation under the Commission's approach. The court assumes that shippers would protest all rates above the 146% level, but it is quite possible that a shipper might not find it worth the expense and effort to protest a particular rate, or a proposed increase for that rate, even though the increase might tend to discourage the shipment of recyclables. Nonetheless, the second sentence of section 204(e) would prohibit any increase in that rate, and thus prevent an even greater barrier to the shipment of recyclables from being erected.
 
 
 45
 The court next maintains that its interpretation of section 204(e) is more faithful to NARI III than is the Commission's construction of the statute. But the NARI III court was faced with the entirely different problem that, under the agency's interpretation at that time, the ICC truly read the first sentence of section 204(e) into meaninglessness. The court was obliged to demonstrate that the first two sentences of section 204(e) could be read so as not to be in conflict and so both could have effect. Thus, the court laid out one approach, consistent with the Commission's historical practice, that the ICC could take which would give meaning to all parts of section 204(e), and at the same time effectuate Congress' intent. 660 F.2d at 799. As I read NARI III, the court neither stated nor implied that territorial averaging was the only approach which the Commission could lawfully embrace. It certainly seems to me that the NARI III court would never have invalidated an approach which both gives meaning to all of section 204(e) and has the happy advantage of coming even closer to achieving Congress' goal of encouraging shipments of recyclables. Indeed, it is, as we would all agree, not the job of the courts to tell an agency how to fulfill its statutory mandate; the judicial role, properly limited, is only to insure that the method the agency chooses is not arbitrary, capricious, or inconsistent with the operative statute. That standard, in my judgment, has been satisfied here.
 
 
 46
 The court nonetheless concludes that the ICC's approach is unfair, in that the spectre of individual shipper complaints and refunds represents a sharp break with past practice and reasonable railroad industry expectations. In particular, the point is pressed that the railroads were not truly put on notice of this change in the railroads' potential refund liability. The ICC, on the other hand, strenuously argues that it did give such notice in clear, plain English. To resolve this debate, it is necessary to quote in context the crucial section of the 1981 Decision:
 
 
 47
 As a practical matter, it would not be feasible to require the carriers to develop ratios for every individual movement. We also realize that tariff changes will be more numerous and complex if the schedule C traffic segments are used. However, to come as close as possible to applying the average figure to individual rates, we will require reductions based on the schedule C traffic segments. This method will best serve the purposes Congress intended to achieve with section 204.
 
 
 48
 Furthermore, should a shipper of nonferrous recyclables believe that his particular rate still exceeds the permissible level, he may file a complaint with the Commission.
 
 
 49
 1981 Decision, 365 I.C.C. at 307.
 
 
 50
 In this passage, the ICC set forth its decision to allow the use of average rates, based on a certain type of data--schedule C traffic segments. Next came the key sentence, stating that a shipper still may file individual complaints. The Commission contends that this statement sent a clear message to both the railroads and shippers that individual rates greater than the 146% level would be subject to refunds even if average rates were at the mandated 146% level. That seems to me an entirely sensible reading of the sentence. The court, however, asserts again and again that this sentence is "cryptic," in that it did not state what action would be taken on a complaint. See Op. at 376, 378, 381. But while the sentence may not be a model of clarity, it is hard to read the passage as having a meaning other than that ascribed to it by the ICC. The sentence does not state what will be done with a shipper's complaint, but it seems ludicrous to suggest that the Commission was inviting shippers to file complaints that would be filed away on some bureaucratic shelf or summarily dismissed. The only reason the Commission, immediately after holding that reductions would be based on average rates, would go on to state that a shipper may "file a complaint" if the shipper believes "his particular rate still exceeds the permissible level" would obviously be that the ICC was prepared to order refunds to shippers whose individual rates were above the 146% level despite the fact that the average rates in its area were at the proper level. Certainly, shippers of recyclables had no difficulty discerning the meaning of the sentence.
 
 
 51
 Regardless of all this, the railroads should not be able to seize upon this perceived ambiguity to their great advantage. The sentence was pivotal, as it followed immediately on the heels of the ICC's precise holding on how to set rates. Even if the railroads were uncertain as to exactly what the sentence meant, they surely could not have believed that it was favorable to their interests, encouraging as it did complaints to be filed against them. But rather than ask the ICC for clarification, the railroads merrily went on about their business, ignoring the sentence completely for a season, and ultimately repairing to this court three years later to pronounce that they were not given fair notice. I can divine no unfairness whatever to the railroads in all this; quite to the contrary, it seems manifestly unfair to permit the railroads now to use to their considerable advantage their skillfully rising above and disregarding what seems to me a crucial, if brief, part of the 1981 Decision. If a party, in truth, does not understand a decision, then the agency's doors are open to a request for clarification; if on the other hand, the party ignores the ambiguity laden with potential for adverse impact, then the party should have to face the music when the agency ultimately renders an interpretation that is, as here, true to the original passage.
 
 
 52
 Finally, in its process of inference-drawing, the court is of the view that the revenue adequacy requirements of section 204(e) are such that, if individualized reductions were allowed, individualized assessments of the revenue-to-variable cost ratio would be required. Op. at 379 - 80 & n. 8. The court's view is that section 204(e) requires that railroads earn a sufficient return on recyclable shipments; thus "if individualized assessments were to be made, it would be as necessary to guard against subsidization as against discrimination." Op. at 380 n. 8. But as I attempted to show previously, both section 204(e) and NARI III make it clear that revenue adequacy is at most a secondary consideration when it comes to the favored class of recyclables.
 
 
 53
 When all is said and done, the Commission has, at long last, come to an entirely defensible and reasonable construction of the pertinent statutory provision, an interpretation which faithfully effectuates Congress' intent. Because the will of Congress with respect to encouraging the use of recyclables, as implemented by the Commission, is subverted by today's decision, I respectfully dissent.
 
 
 
 [1]
 Throughout this opinion, various ratios are mentioned in conjunction with the setting of rates for shipping recyclables. These ratios are expressed as a percentage of the variable costs of shipping recyclables and represent the level of revenues a railroad must earn to recover both the direct or variable costs of moving recyclables and also such fixed costs as overhead, plus a reasonable rate of return
 
 
 [2]
 The full text of Sec. 204(e) reads as follows:
 Notwithstanding any other provision of this title or any other law, within 90 days after the effective date of the Staggers Rail Act of 1980, all rail carriers providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title shall take all actions necessary to reduce and thereafter maintain rates for the transportation of recyclable or recycled materials, other than recyclable or recycled iron or steel, at revenue-to-variable cost ratio levels that are equal to or less than the average revenue-to-variable cost ratio that rail carriers would be required to realize, under honest, economical, and efficient management, in order to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States. As long as any such rate equals or exceeds such average revenue-to-variable cost ratio established by the Commission, such rate shall not be required to bear any further rate increase. The Commission shall have jurisdiction to issue all orders necessary to enforce the requirements of this subsection.
 49 U.S.C. Sec. 10731(e).
 
 
 [3]
 The distinction between territorial average rate reductions and individual rate reductions is crucial to this case. There are millions of separate movements of recyclable commodities in the United States with separate rates for each commodity moving between each pair of locations. Under a system of individualized rate reductions, it is necessary to identify for each rate the directly variable costs of transporting each commodity between each pair of locations and then to compute separately a new rate for each movement. Under a system of territorial average rate reductions, the country is divided into three territories, East, South, and West. Rates are then adjusted to account only for the movements of commodities within each territory and from any one of the territories to another. Accordingly, under the territorial average method many fewer computations are made, and less precise adjustments are possible. This disadvantage is more than compensated for, however, by gains in administrability
 
 
 [4]
 The railroads sought review of the 1981 Decision, and we affirmed in an unpublished order. Baltimore & O.R.R. v. ICC, No. 82-1066, mem. op. (D.C.Cir. June 9, 1982) (unpublished) ("NARI IV "). A subsequent decision on the different problem of terms for cancelling joint rates was also handed down by this court in National Ass'n of Recycling Industries, Inc. v. ICC, 704 F.2d 638 (D.C.Cir.1983) (per curiam) ("NARI V ")
 
 
 [5]
 In Eagle-Picher Industries, Inc. v. EPA, 759 F.2d 905 (D.C.Cir.1985), this court held that it will not conduct a "retrospective ripeness analysis" after the expiration of a statutory review period when a petitioner claims that a late filing is reviewable because the challenge it raises has only recently become ripe. Id. at 909. However, because the court in Eagle-Picher was articulating this rule "for the first time," the panel proceeded to conduct the retrospective ripeness analysis in that case. Id. at 909, 915-19. Since Norfolk & Western was briefed and argued before the decision in Eagle-Picher was issued, we must conduct a similar analysis here
 
 
 [6]
 The dissent suggests, as an alternate construction, that the second sentence might serve the purpose of presenting the Commission with "several options as to how to achieve Congress' goal." Dissent at 382. Under this interpretation, the second sentence prohibits increases in the above-average rates if the Commission chooses to use territorial averaging, but does not compel that choice. While this is not an implausible reading of the statute, it does not lead us to conclude that the 1983 Decision was justified. While the Commission may have been authorized to choose to order refunds on either an average or an individual basis, it was not authorized to order both in such a way as to compel an unreasonable subsidization of recyclables. See infra note 8
 
 
 [7]
 The relevant portion of our discussion in NARI III reads as follows:
 The first sentence of Section 204(e) is clear, explicit and mandatory. It requires all rail carriers, within 90 days after the effective date of the Act, to "take all actions necessary to reduce and thereafter maintain rates ... at revenue-to-variable cost ratio levels that are equal to or less than ..." the average ratio of 146% established by the Commission. If the Commission had so ordered and followed its past practice of requiring rate reductions to be averaged by commodity and/or geographic area, as suggested by the dissenting commissioners, the second sentence becomes equally clear and explicit. Simply stated, it merely prevents any single rate that "equals or exceeds" 146% to be increased until it has gone below that level.
 660 F.2d at 799 (footnotes omitted).
 
 
 [8]
 Section 204(e) contains a requirement that rail carriers of recyclables be allowed a sufficient return "in order to cover total operating expenses, including depreciation and obsolescence, plus a reasonable and economic profit or return (or both) on capital employed in the business sufficient to attract and retain capital in amounts adequate to provide a sound transportation system in the United States." 49 U.S.C. Sec. 10731(e). Accordingly, all parties agree Sec. 204(e) forbids the subsidization of recyclables as surely as it prohibits discrimination against them. Therefore, if individualized assessments were to be made, it would be as necessary to guard against subsidization as against discrimination. Fortunately, such costly case-by-case assessments can be avoided through the use of territorial averaging
 We believe the dissent understates the matter when it suggests that revenue adequacy is "at most a secondary consideration." Dissent at 384. In its report on this bill, the Senate Committee made clear that the provisions of Sec. 204(e) were to be enforced so as to ensure that railroads were not in any way penalized. It noted that "neither the railroads nor any other traffic will be 'subsidizing' recyclables. This traffic will be paying its full way--including all costs, plus a reasonable rate of return to the railroads. It is the Committee's intent that the railroads be afforded their full cost plus a reasonable return on the movement of recyclables...." S.Rep. No. 470, supra, at 34.
 Petitioners raise serious charges that the 1983 Decision will lead to violations of the revenue adequacy requirement of Sec. 204(e). Petitioners note that they have already reduced their rates to the 146% level as computed on a territorial average basis. If further individual rate reductions were now ordered, the industry average could fall below the 146% level thereby denying rail carriers adequate revenue in violation of the explicit command of section 204(e). It is no answer to this charge for the Commission to assert that rail carriers will be able to balance individualized rate reductions with individualized increases, since market pressures may prevent the necessary increases from being realized. In that situation, rail carriers would wrongly be forced to subsidize recyclables overall by reducing rates for recyclables on the most profitable routes.
 
 
 [9]
 The revenue-to-variable cost ratio, which the Commission has set as 146%, is itself an average figure which does not accurately reflect the true cost of shipping recyclables in all individual cases