STATE OF TENNESSEE

v.

**John HERRINGTON, Secretary of the United States Department of Energy.**

No. 3–85–0959.

United States District Court,
M.D. Tennessee,
Nashville Division.

Feb. 5, 1986.

W.J. Michael Cody, Atty. Gen., John Knox Walkup, Chief Deputy Atty. Gen., Frank J. Scanlon, Deputy Atty. Gen., Nashville, Tenn., for plaintiff.

Joe E. Brown, U.S. Atty., James C. Thomason, Asst. U.S. Atty., Nashville, Tenn., Wells D. Burgess, Land and Natural Resources Div., U.S. Dept. of Justice, Gregory Fess, Dept. of Energy, Gen. Counsel, Washington, D.C., for defendant.

### MEMORANDUM

WISEMAN, Chief Judge.

Before the Court, on the State of Tennessee's first cause of action, are cross-motions for summary judgment which require interpretation of certain provisions of the Nuclear Waste Policy Act of 1982 ("NWPA").[1] In 1982, Congress enacted the NWPA, an ambitious statute whose intent was to grapple with the multitude of problems associated with the generation of nuclear waste by commercial power facilities. The federal waste management program articulated by the NWPA focuses on the development of permanent, geologic repositories, and also addresses the temporary disposal and storage of nuclear waste. One such scheme approved for further study is Monitored Retrievable Storage ("MRS"), two characteristics of which are that it would require the repackaging and continuous monitoring of the waste stored in such a facility until it is retrieved, perhaps decades later, for transfer to a perma-

---

1. 42 U.S.C. § 10101–10226 (1982).

nent repository.[2] If determined to be a necessary part in the national waste management system, MRS would serve as a "back-up" to the permanent repositories.[3]

To aid in its determination of the need for MRS, Congress ordered the Secretary of the United States Department of Energy to submit a proposal for the construction of one or more MRS facilities.[4] This proposal was to include a detailed study of the need for and feasibility of MRS and site-specific designs.[5] In late December, 1985, the Secretary completed his final draft MRS proposal.[6] He concluded that a single, integral MRS facility is a necessary component of the waste management system, and decided that this facility should be sited in the State of Tennessee. The Secretary plans to submit this proposal to Congress on or after February 6, 1986.

The specific question before the Court is whether the State of Tennessee is entitled to a declaratory judgment that the Secretary violated the provisions of section 141(h) of the Act, 42 U.S.C. § 10161(h), in making his determination as to the preferred site of the MRS facility, and whether the Secretary should be enjoined from submitting the allegedly flawed portion of the MRS siting study to Congress when the Secretary presents his recommendation.[7] Based upon the Court's analysis of the NWPA and its legislative history, the Court declares that the provisions incorporated in section 141(h) take effect prior to Congressional authorization of an MRS facility. Upon reviewing the voluminous record in this action, the Court also renders a declaratory judgment that the Secretary has violated section 117(b) of the Act, 42 U.S.C. § 10137(b), by failing to consult and cooperate with the State of Tennessee in conducting extensive siting studies. Thus,

the siting portion of the Secretary's final proposal is fatally flawed. Partial summary judgment is granted to the State of Tennessee upon its first cause of action. Accordingly, the Secretary may submit no portion of the proposal to Congress which relates in any way to the siting and identification study which failed to comply with the consultation and cooperation requirements of the NWPA.

All parties concerned will benefit by a short statement of what this ruling is, and is not, about. The Court cannot express its personal views on nuclear energy in general or on the proper role of Monitored Retrievable Storage in achieving society's goal of permanent and safe resolution of the dangers of rapidly accumulating nuclear waste. This Court can determine, however, whether the law has been violated by the Secretary of Energy. This Court declares, without hesitation, that the Secretary has failed to carry out the statutory duties assigned to him. The Secretary has taken very few steps to achieve the clear purposes of the statute, which envisions that the states be granted the broadest possible rights in participating in the development of MRS facilities and in gaining the public's trust in the federal waste management program.

## I.

## Jurisdiction

At the outset, the Court must address the threshold issue of jurisdiction. Recently the Court considered the defendant's motion to dismiss this action based upon the argument that the NWPA vested original jurisdiction over cases arising under the Act in the circuit courts of appeals. *See Tennessee v. Herrington,* 622 F.Supp. 923

---

**2.** *See generally The Need For and Feasibility of Monitored Retrievable Storage—A Preliminary Analysis,* DOE/RW 0022 (Apr. 1985) (Plaintiff's Exhibit C).

**3.** *See generally id.*

**4.** *See* 42 U.S.C. § 10161(b) (1982).

**5.** *See id.*

**6.** *See Monitored Retrievable Storage Submission to Congress,* DOE/RW (review copy) (Dec. 1985) (Plaintiff's Exhibit J).

**7.** In the alternative, the State of Tennessee seeks a writ of mandamus under 28 U.S.C. § 1361 to compel the Secretary to comply with certain provisions of the NWPA.

(M.D.Tenn.1985) (*"Tennessee I"*). This Court examined the plain language of the NWPA and concluded that exclusive jurisdiction over this action was vested in the district court.[8] The Court certified its order for interlocutory review pursuant to 28 U.S.C. § 1292(b). No action has yet been taken on this expedited appeal. In the absence of any Sixth Circuit action on the jurisdiction issue, and in view of the fact that the Secretary intends to make his MRS recommendation to Congress on or soon after February 6, 1986, this Court must act expeditiously on the merits of the case.

## II.

### MRS Background

At the heart of this litigation lies the following statutory provision: "Any facility authorized pursuant to this section shall be subject to the provisions of sections 10135, 10136(a), 10136(b), 10136(d), 10137, and 10138 of this title."[9] This subsection, which applies to any MRS facility, incorporates nearly all of the state participation requirements applying to permanent repositories.[10] Its interpretation is determinative of this action.

The dispute in this case turns on the time at which the state consultation and cooperation requirements of section 117 of the Act, 42 U.S.C. § 10137, are triggered. The State of Tennessee maintains that these requirements necessarily apply to all of the DOE's activities subsequent to the initial steps taken in the MRS siting process. Thus, the DOE would be required to seek the state's participation in the siting process and give substantive weight to the state's comments in its decision. The Secretary argues, in contrast, that the DOE has no duty to consult and cooperate with the State prior to Congressional authorization of an MRS facility, and that the DOE discharges its responsibilities by submitting the State's comments to Congress. In determining the outcome of this action, the Court must consider the facts of the case and examine the general statutory structure of MRS.

### A. *Facts*

On April 25, 1985, the director of the Office of the Civilian Radioactive Waste Management of DOE formally notified Tennessee Governor Lamar Alexander of the DOE's intent to ask Congress in January,

8. In its earlier opinion, the Court carefully distinguished two opinions from the District of Columbia Circuit, which held that original jurisdiction over actions challenging the fee provisions of the NWPA was vested exclusively in the circuit courts of appeals. *See General Electric Uranium Management Corp. ("GEUMCO") v. DOE,* 764 F.2d 896 (D.C.Cir.1985); *Wisconsin Electric Power Co. v. Hodel,* 626 F.Supp. 424, (D.D.C.1984). Since this Court's opinion was issued, the D.C. Circuit, expressly following *GEUMCO,* affirmed the lower court's jurisdictional conclusion in *Wisconsin Electric. See Wisconsin Electric Power Co. v. DOE,* 778 F.2d 1 (D.C.Cir.1985). This recent decision is inconsistent in some respects, in that it follows *GEUMCO'*s overly broad interpretation of the NWPA on the jurisdiction question, but upon reaching the action's merits, interprets the language of certain provisions of the Act strictly.

9. 42 U.S.C. § 10161(h) (1982). "Title" refers to Subchapter I of the NWPA. *See* H.R.Rep. No. 491(I), 97th Cong., 2d Sess. 49, *reprinted in* 1982 *U.S.Code Cong. & Ad.News,* 3792, 3815. Furthermore, any reference in the incorporated

provisions to a repository shall be considered to be a reference to an MRS facility.

10. The lone exception is section 116(c) of the Act, 42 U.S.C. § 10136(c), which requires that financial assistance be granted to states for the purpose of their participating in all activities required by sections 116 and 117 of the Act, 42 U.S.C. §§ 10136–37. The MRS section contains its own financial assistance provision, which requires the Secretary to make annual "impact aid payments" to local governments in order to mitigate the economic and social impacts resulting from the construction and operation of an MRS facility. *See* 42 U.S.C. § 10161(f) (1982). The NWPA itself does not require the Secretary to compensate the states for their efforts in the MRS consultation and cooperation process in connection with the MRS siting. The Secretary volunteered to provide the states with funds and technical assistance to help them "gain an understanding of the impacts of siting an MRS within its jurisdiction and, subsequently, to form independent opinions regarding MRS acceptability." Plaintiff's Exhibit A; Defendant's Exhibit B.

1986, to authorize construction of an MRS facility in Tennessee.[11] In addition to the notice to Governor Alexander, the DOE announced its MRS proposal in the Federal Register the following day, identifying Tennessee as the preferred location for such a facility.[12] The "Screening and Identification Study" released by the DOE, which identified potential MRS sites,[13] revealed that an extensive siting process already had been completed. The DOE also expressed its intent to work closely with the states and public "to prepare the best supporting documentation possible" for the Secretary's proposal to Congress, to allow all affected parties to express their views during development of the proposal, and to provide complete information to the states and public "which will allow their informed participation in the Congressional decision-making process." [14]

Since the "Screening and Identification Study" was announced to the public on April 26, 1985, Tennessee officials have scrambled to "catch up" with the DOE and study the potential impacts of MRS on the state. The state executive body which was delegated responsibility for determining the impact of MRS has, among other actions, conducted studies, requested information from the DOE on MRS technology and the three "preferred" sites in the state, organized public hearings, sponsored a toll-free telephone line for public polling pur-

---

**11.** Plaintiff's Exhibit A; Defendant's Exhibit B.

**12.** *See* 50 Fed.Reg. 16, 536 (Apr. 26, 1985). This announcement revealed that several MRS studies relating to the State of Tennessee had been completed or were in the process of being prepared. One was the preliminary needs and feasibility study, *The Need For & Feasibility of Monitored Retrievable Storage—A Preliminary Analysis,* DOE/RW 0022 (Apr. 1985) (Plaintiff's Exhibit C), which justified the "concept" of an "integral" MRS facility developed in conjunction with the permanent repository system. *See* 50 Fed.Reg. 16, 536 (Apr. 26, 1985). The DOE also announced the release of an extensive site screening study, *Screening & Identification of Sites For a Proposed Monitored Retrievable Storage Facility,* DOE/RW 0023 (Apr. 1985) (Plaintiff's Exhibit D; Defendant's Exhibit C) ("Screening and Identification Study"), identifying three sites in Tennessee as "candidate MRS sites," which include a preferred site and two alternate sites. The DOE stated that the Tennessee sites were preferrable to the eight sites in other southeastern states which were judged by the DOE to be "potentially acceptable" in an initial screening. *Id.* at 42. *See Monitored Retrievable Storage Facility Site Screening & Evaluation Report,* DOE/NBB–0071 (May 1985) (3 volumes) (Defendant's Exhibit C). In its announcement, the DOE also stated its intention to prepare environmental assessments of the potential sites in Tennessee as required by section 141(c) of the NWPA, 42 U.S.C. § 10161(c), *see* Fed.Reg. 16,536 (Apr. 26, 1985), and to provide funds and technical assistance to Tennessee to help the state understand the potential impacts of MRS. *Id.* at 16,535.

The Secretary's obviously extensive and time-consuming identification and screening process consisted of four steps. First, the Secretary identified eleven potentially acceptable sites by applying a short list of screening factors. *See*

*Screening & Identification Study* at 9, 22–26. This first step involved identifying potential sites (1) in a preferred southeast region, (2) which were either owned by DOE or docketed with the NRC, and (3) which had 1,100 available acres. *Id.* at 4–8. In the second step of the analysis, "the eleven sites were thoroughly analyzed by a task force of specialists in eight areas important to evaluating site suitability." *Id.* at 9. These eight factors were as follows:

(1) ease of regulatory compliance; (2) existing environmental setting; (3) geotechnical site characteristics; (4) socioeconomic setting and changes which might be induced by MRS development; (5) institutional and administrative structure of the state; (6) local transportation characteristics; (7) access to physical infrastructure (e.g., utilities); (8) capital cost of construction.

*Id.* Using these criteria, the Secretary concluded that an MRS facility could be constructed at any one of the eleven sites. *Id.* at 33. Ranking of these sites was left to the subjective evaluations of DOE officials in the third and fourth stages of the Secretary's siting process. In the third stage, the DOE attempted to anticipate various problems which might be encountered in developing an MRS at each of the eleven potential sites, including the potential for delay. *Id.* at 10. DOE officials in the fourth stage of the siting process attempted to determine the sites at which they believed an MRS facility "could most successfully be deployed." *Id.* The Secretary thereafter eliminated two sites from consideration, identified the three Tennessee sites as being preferable and therefore "candidate sites," and identified the Clinch River Breeder Reactor site near Oak Ridge, Tennessee, as most preferable. *Id.* at 41–45.

**13.** *See id.*

**14.** 50 Fed.Reg. 16,537 (Apr. 26, 1985).

poses, and accepted petitions from the state's citizens regarding the siting of an MRS facility in Tennessee.

During the period from April, 1985, until December, 1985, the DOE's efforts to comply with the State's requests for information were hindered because several studies were as yet being prepared. In fact, the final draft of several documents was not completed until late December, 1985. In August, 1985, expressing concern that it had not received several key elements of the MRS proposal, such as a waste transportation study, and cost and benefit and risk assessment comparisons among system alternatives, the State requested that it be given ninety days to study the final proposal before it was submitted to Congress, in order for the State to prepare a "studied opinion" for submission to Congress.[15] Increasingly frustrated by the Secretary's failure to provide essential MRS studies for state review, the State of Tennessee filed this action on August 20, 1985.

The Secretary has denied the State's request for a grace period by his actions. Subsequent to the filing of this suit, the Secretary has continued to supply the State with information as he felt it became available and also has provided preliminary drafts of studies as they were completed. On December 24, 1985, the State of Tennessee received the final MRS proposal and was advised that the proposal would be presented to Congress shortly after February 6, 1985. The DOE also informed the State that any comments received from the State by that time would be forwarded directly to Congress, and that the State could provide additional comments to the members of Congress during their deliberations on the MRS proposal.

### B.  *Section 141*

In 1982, the NWPA charged the DOE with the long-term responsibility of drafting a detailed study of the need for and feasibility of the construction of one or more MRS facilities.[16] The DOE has been actively engaged in this process for the past three years, and has completed a final draft MRS proposal to Congress.[17] The NWPA also required the DOE to comply with the provisions incorporated in section 141(h), 42 U.S.C. § 10161(h), which also apply to the repository siting process. Generally, these provisions call for the participation of affected states in the siting of MRS facilities, and require consultation and cooperation between the Secretary of Energy and these states.

The NWPA requires the Secretary, within ninety days of the effective date of the Act (January 7, 1983), to identify states with one or more potentially acceptable sites for an MRS facility.[18] Within ninety days of this identification, the Secretary must notify the Governor and legislature of any potentially acceptable sites within the state.[19] The NWPA places on the Secretary an ongoing duty to keep the state informed as to the progress of the plans being made for the MRS facility.[20] The Act also requires that the Secretary engage in a process of "consultation and cooperation" with the state in a effort to resolve the concerns of the state regarding MRS.[21] Furthermore, the Secretary is required to attempt to negotiate a binding

---

**15.** *See* Plaintiff's Exhibit F; Defendant's Exhibit O (letter from James Word to Ben Rusche (Aug. 9, 1985)).

**16.** The NWPA required that this study include a site-specific facility design, a program plan covering funding and integration of the MRS facility with other storage and disposal facilities authorized by the Act, and an environmental assessment for each of three alternative sites. *See* 42 U.S.C. § 10161(b) (1982). The Secretary must prepare the environmental assessments in compliance with the regulations promulgated

pursuant to the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1982).

**17.** *See Monitored Retrievable Storage Submission to Congress,* DOE/RW (review copy) (Dec. 1985) (Plaintiff's Exhibit J).

**18.** *See* 42 U.S.C. § 10136(a) (1982).

**19.** *See id.*

**20.** *See* 42 U.S.C. § 10137(a) (1982).

**21.** 42 U.S.C. § 10137(b), (c) (1982).

written agreement with the state to determine how the consultation, cooperation, and exchange of information under section 117(a) and (b), 42 U.S.C. § 10137(a)–(b), will be conducted.

After the Secretary submits his MRS proposal to Congress, the NWPA grants the right to *disapprove* the Secretary's proposed MRS site within a specified time period to three state entities: (1) the Governor of the State; (2) the state legislature; or (3) some other entity or person so designated by state law in lieu of the Governor or legislature.[22] In the event a state issues a notice of disapproval, Congress may override the state veto within ninety days by resolution of both the Senate and House of Representatives.[23] If the site selected by the Secretary is not challenged by the affected state or if it survives the disapproval process, the MRS proposal itself must be approved by Congressional enactment.[24]

If Congress authorizes the construction of an MRS facility, two additional steps are required before the facility can be constructed. First, the Secretary must prepare a qualified environmental impact statement.[25] Second, the MRS must be licensed by the Nuclear Regulatory Commission.[26] Finally, should Congress authorize construction of an MRS facility, the Secretary must commence making annual impact aid payments drawn from the Nu-

clear Waste Fund[27] "to appropriate units of general local government in order to mitigate any social or economic impacts resulting from the construction and subsequent operation" of an MRS facility.[28]

### III.

#### Justiciability

■ Extraordinary remedies are requested. The State of Tennessee asks the Court to grant a declaratory judgment that the Secretary violated the consultation and cooperation requirements of section 117 of the Act, 42 U.S.C. § 10137, in conducting a study of three sites in Tennessee for the purpose of determining their suitability for an MRS facility without any type of state participation in the study.[29] The State also requests that the Court issue an injunction against the Secretary to prevent him from relying upon any part of this study in making his MRS proposal to Congress. The State further seeks partial summary judgment on its first cause of action, its challenge to the siting process followed by the Secretary. The Secretary counters that this issue is not ripe for judicial review.[30] An essential consideration in determining whether a declaratory judgment may be granted is whether the matter is "ripe" for review.

---

22. *See* 42 U.S.C. § 10136(b)(1) (1982).

23. *See* 42 U.S.C. § 10135(c), (d), & (e) (1982).

24. *See* 42 U.S.C. § 10161(b)(1), (b)(2)(C), (c)(2) (1982).

25. *See* 42 U.S.C. § 10161(c)(2) (1982). The environmental impact statement must comply with the provisions of the National Environmental Policy Act of 1969, 42 U.S.C. §§ 4321–4347 (1982); however, the statement need not consider the need for the MRS facility. 42 U.S.C. § 10161(c)(2) (1982).

26. *See* 42 U.S.C. § 10161(d) (1982).

27. *See* 42 U.S.C. § 10222(i) (1982).

28. *See* 42 U.S.C. § 10161(f)(1) (1982).

29. The study referred to is the "Screening and Identification Study," described in note 12 *supra.*

30. The Secretary asks that he be awarded partial summary judgment on the State's first cause of action on the basis that it is not ripe for judicial resolution. The Secretary requests an inappropriate remedy. Actions which are not ripe for review shall be dismissed without prejudice, and later may be reasserted. For an example of this general principle, *see Brown v. Ferro Corp.,* 763 F.2d 798 (6th Cir.), *cert. denied* —— U.S. ——, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985). Defendant's motion for partial summary judgment must, therefore, be denied.

On the other hand, the State argues that the issue of ripeness is inappropriate for consideration on summary judgment, and therefore the Secretary has waived any objection to the ripeness of the issue by failing to present this argument in his motion to dismiss the complaint for lack of jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Since this issue may be dispositive of the action, the Court shall consider it here.

### A. *Ripeness*

■ The ripeness doctrine rests both on concepts embodied in Article III of the Constitution and on discretionary policy. *See, e.g., Brown v. Ferro Corp.,* 763 F.2d 798, 801 (6th Cir.) *cert. denied,* —— U.S. ——, 106 S.Ct. 344, 88 L.Ed.2d 291 (1985); *Johnson v. Sikes,* 730 F.2d 644, 648 (11th Cir.1984). It is invoked to determine whether a dispute has matured to the point that it warrants judicial resolution. *See, e.g., Brown,* 763 F.2d at 801 (quoting 13A Wright, Miller & Cooper, *supra,* § 3532). Although the law of ripeness was "once a tangle of specialistic rules and legalistic distinctions, [it] is now very much a matter of practical common sense." *Continental Air Lines, Inc. v. Civil Aeronautics Board,* 522 F.2d 107, 124 (D.C.Cir.1974). Applying this common sense approach to the present action, the Court finds that the matter is ripe for review.

In *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), the leading exposition of the ripeness doctrine, the Supreme Court stated:

> The injunctive and declaratory judgment remedies are discretionary, and courts traditionally have been reluctant to apply them to administrative determinations unless these arise in the context of a controversy "ripe" for judicial resolution. Without undertaking to survey the intricacies of the ripeness doctrine it is safe to say that its basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148–49, 87 S.Ct. at 1515–16, 18 L.Ed.2d at 691 (footnote omitted), *quoted in Pacific Gas & Elec. Co. v. State Energy Resources Conserv. & Dev. Comm'n,* 461 U.S. 190, 200–01, 103 S.Ct. 1713, 1720, 75 L.Ed.2d 752, 763 (1983). The *Abbott Laboratories* Court further stated that the question of ripeness turns on the assessments of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." 387 U.S. at 148, 87 S.Ct. at 1516, 18 L.Ed.2d at 691. *See, e.g., Pacific Gas,* 461 U.S. at 201, 103 S.Ct. at 1720, 75 L.Ed.2d at 763 (quoting *Abbott Laboratories*); *Brown,* 763 F.2d at 801 (quoting *Abbott Laboratories); Young v. Klutznick,* 652 F.2d 617, 625 (6th Cir.1981), *cert. denied,* 455 U.S. 939, 102 S.Ct. 1430, 71 L.Ed.2d 650 (citing *Toilet Goods Association v. Gardner,* 387 U.S. 158, 162, 87 S.Ct. 1520, 1523, 18 L.Ed.2d 697, 701 (1967)).

In arguing that this question is not ripe for review, the DOE relies on a four-part test stated in *Texas v. DOE,* 764 F.2d 278 (5th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 531, 88 L.Ed.2d 463 (1985). In *Texas,* the State of Texas sought review of the DOE's designation pursuant to section 116(a) of the Act, 42 U.S.C. § 10136(a), of two sites within the state as "potentially acceptable" for development as permanent repositories. The agency action challenged in *Texas* occurred at the very first stage of the site selection process under the NWPA. The court set forth the familiar Fifth Circuit test, citing *Abbott Laboratories,* 387 U.S. at 149–54, 87 S.Ct. at 1515–18, 18 L.Ed.2d at 691–95, which provides that four factors are relevant in determining whether an action is ripe:

> (1) whether the issues presented are purely legal; (2) whether the challenged agency action constitutes "final agency action" within the meaning of the APA; (3) whether the challenged action has or will have a direct and immediate impact on the petitioner; and (4) whether resolution of the issues will foster, rather than impede, effective enforcement and administration by the agency.

*Texas,* 764 F.2d at 283. *See, e.g., Pennzoil Co. v. Federal Energy Regulatory Comm'n ("FERC"),* 742 F.2d 242, 244 (5th Cir.1984); *Pennzoil Co. v. FERC,* 645 F.2d 394, 398 (5th Cir.1981); *Ecee, Inc. v. FERC,* 611 F.2d 554, 556 (5th Cir.1980). Assuming

for the sake of argument that the challenged action was "final,"[31] the court held that none of the other criteria necessary for ripeness were met.

The *Texas* court found that the issues presented were not purely legal because judicial review of the Secretary's site screening process would be more meaningful after the environmental assessments were completed. The Court further stated that the Secretary's decision did not have the requisite "immediate and direct impact" on the petitioners, 764 F.2d at 284 (citing *FTC v. Standard Oil Co.*, 449 U.S. 232, 244, 101 S.Ct. 488, 495, 66 L.Ed.2d 416, 426–27 (1980), because the State and its citizens could attempt to influence the Secretary's decision through the public hearing process established in section 112(b)(2) of the Act, 42 U.S.C. § 10132(b)(2). Finally, the court stated that judicial review at this early stage would interfere with the administrative process underway in Texas by delaying the siting process and encouraging the petitioners to forego their public hearing opportunities. *Texas*, 764 F.2d at 284.

While courts in this circuit focus on the *Abbott Laboratories* two-prong analysis in making a ripeness determination (i.e., that of requiring an inquiry into both the "fitness of the issues" for judicial resolution and "the hardship to the parties" if judicial relief is denied at that stage, 387 U.S. at 149, 87 S.Ct. at 1515, 18 L.Ed.2d at 691,)[32] they recognize that numerous factors may be relevant in this determination, including those enumerated by the *Texas* court. *See,*

*e.g., Allstate Insurance Co. v. Wayne County*, 760 F.2d 689, 696–97 (6th Cir.1985) (review of factors considered by courts); *Cumberland Capital Corp. v. Harris*, 490 F.Supp. 551, 556–57 (M.D.Tenn.1977), *rev'd on other grounds*, 621 F.2d 246 (6th Cir. 1980).

First, the Court concludes that the issue before it is a purely legal question. The DOE claims that the Court does not have a complete and "specific [factual] framework within which the [DOE's] decision can properly be evaluated," *Texas*, 764 F.2d at 284, because at the time of its response to the summary judgment motion, neither the environmental assessment nor the final MRS proposal had been completed.[33] These studies, however, are not relevant to the Court's determination of whether the Secretary violated the consultation and cooperation requirements of the Act. The Secretary asserts that the language of section 141(h) of the Act, 42 U.S.C. § 10161(h), demonstrates that the incorporated provisions take effect only after Congress authorizes the construction of an MRS facility. The State flatly denies this. Whether or not the Secretary actually has complied with the statutory requirements does not affect the determination of ripeness. Only the propriety of a declaratory judgment is affected.

Second, it is clear that this action survives the hurdle of finality. The Secretary argues that no "final" agency action has occurred within the meaning of the Administrative Procedures Act because the siting study which was completed prior to notifi-

---

**31.** The court earlier had concluded that agency action would not be "final" until the nominations of five sites suitable for "site characterization" were made pursuant to section 112 of the Act, 42 U.S.C. § 10132. Each nomination was required to be accompanied by an environmental assessment of that site. 42 U.S.C. § 10132(b)(1)(E) (1982). One factor relevant to the decision was the fact that Congress, in 42 U.S.C. § 10132(b)(1)(F)(i) specified the issuance of any environmental assessment to be a final agency action subject to judicial review in accordance with 42 U.S.C. § 10139 and the APA. *See Texas,* 764 F.2d at 282. The Court stated that the State could reassert its challenge after

the nomination of Texas sites, if any was made. *Id.*

**32.** *See, e.g., Brown,* 763 F.2d at 807 (Merritt, J., dissenting).

**33.** At the time of the issuance of this opinion, both studies in fact have been delivered to the Administrator of the Environmental Protection Agency and the Commissioner of the Nuclear Regulatory Commission as required by section 141(b)(3) of the Act, 42 U.S.C. § 10161(b)(3), and to Tennessee officials. *See* Plaintiff's Exhibit H.

cation of the State of Tennessee [34] was merely a "procedural step in an as yet uncompleted process." [35] Whether or not this study by itself was a final action is a moot question, because the circumstances have changed in this case. "[R]ipeness is peculiarly a question of timing," *Blanchette v. Connecticut General Insurance Corp.*, 419 U.S. 102, 140, 95 S.Ct. 335, 337, 42 L.Ed.2d 320, 351 (1974), *quoted in Allstate Insurance Co.*, 760 F.2d at 696; therefore, it is the present situation, rather than the situation at the time the dispositive motion and responses were filed, that must govern. The DOE completed the draft MRS proposal and environmental assessments of the Tennessee sites in final form in December, 1985.[36] Shortly after February 6, 1986, the Secretary plans to submit these studies in their present form to Congress as required by section 141(b) & (c) of the Act, 42 U.S.C. § 10161(b) & (c), and he has stated that he will also transmit to Congress any comments which the State of Tennessee would care to submit.[37] The State seeks to enjoin the presentation of the siting studies which it contends are fatally flawed and are final.

The Court agrees that the MRS siting process is not yet complete, because Congressional authorization and the completion of an environmental impact statement are required before such a facility may be built. The proposal for the construction of an MRS facility in Tennessee, which has been completed for presentation to Congress, satisfies the finality requirement. This proposal is a definitive recommendation of a federal agency to Congress, not an informal or tentative action.[38] Unless this Court considers Tennessee's complaint now, the State will be deprived of the opportunity to correct the defects in the siting study upon which the proposal is based. Otherwise, the DOE's recommendation of Tennessee as the preferred site for MRS will be a *fait accompli*. Based on the preceding discussion, it is clear that the final draft proposal is a final determination by the DOE sufficient to support a conclusion that this action is ripe for consideration. This analysis comports with the "pragmatic" and "flexible" view of finality expressly approved by the Supreme Court in *Abbott Laboratories* with respect to the review of administrative actions.[39] *See also Nevada v. Herrington*, 777 F.2d 529, 535 (9th Cir.1985) (in an appeal from the Secretary's final decision to deny reimbursement of the state's expenditures on siting studies designed to evaluate the DOE's repository studies, the internal agency guidelines relied upon in the decision could be reviewed as "a definitive statement of the agency's position").

34. The study referred to is the "Screening and Identification Study," described in note 12 *supra*.

35. Defendant's Response at 11.

36. *See Monitored Retrievable Storage Submission to Congress*, DOE/RW (review copy) (Dec. 1985) (Plaintiff's Exhibit J).

37. *See* Plaintiff's Exhibit H (letter from Ben Rusche to James Word).

38. This study is tentative in the respect that the Secretary does not have the authority unilaterally to implement the proposal. It is, however, a definitive statement of the Department of Energy's position. *Compare Abbott Laboratories*, 387 U.S. at 151, 87 S.Ct. at 1517, 18 L.Ed.2d at 693 (regulation which was promulgated by formal rulemaking procedures, was made effective upon publication, and with which compliance was expected was not informal or tentative); *Independent Bankers Ass'n of America v. Smith*, 534 F.2d 921, 928–29 (D.C.Cir.), *cert. denied*, 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 141 (1976) (although the Comptroller of the Currency's interpretive ruling was not issued after formal notice-and-comment hearings, his ruling was just as "definitive" as the regulation in *Abbott Laboratories*, meaning that "administrative reconsideration of the ruling seems quite unlikely," *id.* at 929, considering the Comptroller's rejection of a request for such rulemaking proceedings).

39. 387 U.S. at 149–50, 87 S.Ct. at 1515, 18 L.Ed.2d at 691–92 (citing *United States v. Storer Broadcasting Co.*, 351 U.S. 192, 198, 76 S.Ct. 763, 768, 100 L.Ed. 1081, 1088 (1956); *Frozen Food Express v. United States*, 351 U.S. 40, 45, 76 S.Ct. 569, 572, 100 L.Ed. 910, 915 (1950); & *Columbia Broadcasting System v. United States*, 316 U.S. 407, 418–19, 62 S.Ct. 1194, 1200–01, 86 L.Ed. 1563, 1571 (1942)).

Third, the Court must balance the hardships to the parties of withholding court consideration. The Secretary's siting study obviously has a direct and immediate impact on the State of Tennessee. The State seeks to prevent the Secretary's use of an allegedly deficient study for the purpose of convincing the members of Congress that not only is MRS required as part of the national waste management program, but also that such a facility should be built in Tennessee. The effects of the Secretary's recommendation may have a substantial impact on Tennessee. The State faces immediate harm because it has no other recourse in challenging the position taken by the DOE study. The fact that the DOE will transmit the State's comments to Congress does nothing to negate the hardship to the State. Tennessee faces the immediate threat of irrevocable injury because of its designation as the state containing the three "preferred" sites for such a facility.

On the other side of the scale, the Court finds little, if any, hardship to the Secretary in granting court consideration of the issue. The Secretary can only profit from an early determination of the issue, which will eliminate the cloud of speculation over the validity of its study.

Fourth, judicial review at this juncture will not interfere with the administrative decision-making process. The Secretary has made his determination as to which sites to recommend. The Secretary complains merely about the result which may be reached. Requiring the Secretary to delay the presentation of his MRS proposal to Congress until he has complied with the consultation and cooperation requirements would merely delay the presentation of the proposal. In light of the fact that Congress ordered that the MRS proposal be presented by June 1, 1985, see 42 U.S.C. § 10161(b)(1), and that the Secretary has delayed his presentation until eight months after its required deadline due to his inability to complete the proposal, the effect of a further short delay would be de minimus. If the Secretary is found to have violated the statute, the administrative process will be better served if the Secretary is required to correct his errors. Thus, the balance of hardship, along with an evaluation of the fitness for review of the issue presented, lead to the conclusion that the plaintiff's challenge presents a justiciable case or controversy for judicial resolution.

## B. Declaratory Judgment

The Declaratory Judgment Act allows the federal courts, in their "sound discretion," Grand Trunk Eastern Railroad Co. v. Consolidated Rail Corp., 746 F.2d 323, 325 (6th Cir.1984),[40] to render declaratory judgments only where there exists an "actual controversy." 28 U.S.C. § 2201 (1982).[41] The classic statement of the constitutional and statutory test is that a federal district court may grant declaratory relief only if there is a substantial controversy of sufficient immediacy between parties having adverse legal interests. See, e.g., Lake Carriers' Association v. MacMullan, 406 U.S. 498, 506, 92 S.Ct. 1749, 1755, 32 L.Ed.2d 257, 266 (1972) (quoting Maryland Casualty Co. v. Pacific Coal & Gas Co., 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed.2d 826, 829 (1941)); Golden v. Zwickler, 394 U.S. 103, 108, 89 S.Ct. 956, 959–60, 22 L.Ed.2d 113, 118 (1969); Sullivan v. Division of Elections, 718 F.2d 363, 365 (11th Cir.1983); Crossen v. Breckenridge, 446 F.2d 833, 838 (6th Cir.1971), va-

**40.** Citing 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2759, at 645 (1983). See, e.g., Public Affairs Associates, Inc. v. Rickover, 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604, 606 (1962); Southeastern Promotions, Ltd. v. Conrad, 486 F.2d 894, 901 (6th Cir.1974), rev'd on other grounds, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

**41.** The latter requirement is a "jurisdictional prerequisite of constitutional dimensions,"

Crown Drug Co. v. Revlon, Inc., 703 F.2d 240, 243 (7th Cir.1983) (quoting Grafon Corp. v. Hausermann, 602 F.2d 781, 783 (7th Cir.1979), which incorporates the "case or controversy" requirement of Article III, § 2, cl. 1, of the U.S. Constitution into the remedy of declaratory judgment. See, e.g., Aetna Life Insurance Co. v. Haworth, 300 U.S. 227, 239–40, 57 S.Ct. 461, 463, 81 L.Ed. 617, 621 (1937); Interdynamics, Inc. v. Wolf, 698 F.2d 157, 166 (3d Cir.1982).

*cated,* 410 U.S. 950, 93 S.Ct. 1413, 35 L.Ed.2d 683 (1973). A justiciable controversy exists in this action.

■ In determining whether a declaratory ruling is appropriate, the court must apply the following general principles:

> The two principal criteria guiding the policy in favor of rendering declaratory judgments are (1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding. It follows that when neither of these results can be accomplished, the court should decline to render the declaration prayed.

E. Borchard, *Declaratory Judgments* 299 (2d ed. 1941), *quoted in Grand Trunk Western Railroad Co. v. Consolidated Rail Corp.,* 746 F.2d 323, 326 (6th Cir. 1984). *See also* 10A Wright, Miller & Kane, *supra,* § 2759, at 647. The Court will exercise its discretion in applying these principles to the following analysis of the NWPA.[42]

## IV.

### Statutory Construction

Two issues of construction are presented in this case of first impression: (1) When do the consultation and cooperation requirements of section 117 take effect in the MRS siting process? and (2) What consultation and cooperation requirements apply to the MRS siting process? Unfortunately, the inartful drafting of the NWPA makes the search for the answers to these questions more difficult than it should be.

### A. *When*

The provision under scrutiny is section 141(h) of the Act, 42 U.S.C. § 10161(h), which states in applicable part that "[a]ny facility authorized pursuant to this section shall be subject to" the provision of section 117, 42 U.S.C. § 10137. As noted earlier, the Secretary, focusing on the term "authorized," urges the Court to adopt the view that the consultation and cooperation requirements of section 117 of the Act, 42 U.S.C. § 10137, which are incorporated in section 141, apply only after Congressional authorization of an MRS facility. The State, taking the position that the term "authorized" refers to an MRS facility "generally contemplated for study and development by the Secretary and presentation to Congress,"[43] argues that section 117's requirements take effect early in the MRS siting process.

### 1. *Statutory Language*

■ Established rules of statutory construction require that the Court look first at the language of the statute, and if that is plain, then the Court must enforce it according to its terms. *See, e.g., Dickerson v. New Banner Institute, Inc.,* 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845, 853 (1983); *United States v. Graham Mortgage Corp.,* 740 F.2d 414, 417 (6th Cir.1984); *Henry T. Patterson Trust v. United States,* 729 F.2d 1089, 1094 (6th Cir.1984). Further, where a statute is clear and unambiguous on its face, a court ordinarily will not look to the legislative history to change the statute's application. *See Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 701, 66 L.Ed.2d 633, 638 (1981); *Henry T. Patterson Trust,* 729 F.2d at 1094; *Pope v. Rollins Protective Services Co.,* 703 F.2d 197, 206 (5th Cir.

---

42. The Supreme Court has warned against a grant of declaratory judgment involving an important question of public law on the basis of a sparse and inadequate record. *See, e.g., Askew v. Hargrave,* 401 U.S. 476, 478–79, 91 S.Ct. 856, 858, 28 L.Ed.2d 196, 199 (1971); *A.L. Mechling Barge Lines, Inc. v. United States,* 368 U.S. 324, 330–31, 82 S.Ct. 337, 341–42, 7 L.Ed.2d 317, 322–23 (1962); *Public Affairs Associates, Inc. v.*

*Rickover,* 369 U.S. 111, 112, 82 S.Ct. 580, 582, 7 L.Ed.2d 604, 606 (1962). This danger is nonexistent in this action, as is evidenced by the thousands of pages of "administrative record" which has been filed with this Court, and because the facts are undisputed.

43. Plaintiff's Memorandum at 34.

1983); *Hilliard v. United States,* 310 F.2d 631, 632 (6th Cir.1962).

■ However, section 141(h) is susceptible to contradictory interpretations. It is true, as defendant points out, that in each of the six other instances in section 141 (other than subsection (h)) in which the term "authorized" was used, *congressional* authorization of an MRS facility was the meaning intended.[44] In each of these instances, however, that meaning was either specifically stated or clearly could be inferred from the language of the statute because prior Congressional involvement was necessary to implementation of the particular procedure (i.e., the environmental impact statement and facility licensing).[45] Because the provisions incorporated in section 141(h) are capable of application both before and after Congressional authorization, the section is not unambiguous on its face. Where, as in this case, the literal language of the statute does not conclusively reveal the intent of Congress, courts must look beyond the literal meaning and analyze the particular provision in context with the whole. *Kokoszka v. Belford,* 417 U.S. 642, 650, 94 S.Ct. 2431, 2436, 41 L.Ed.2d 374, 381 (1974); *In re Arnett,* 731 F.2d 358, 361 (6th Cir.1984). Thus, the Court must examine the Act's legislative purpose in order to interpret and apply section 141(h).

### 2. *Statutory Purpose*

The primary function of the courts in applying statutory enactments is to effectuate the intent of the legislature. *Philbrook v. Glodgett,* 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525, 533 (1975); *In re Arnett,* 731 F.2d at 360. This responsibility is especially important when, as in the instant case, the Court must reconcile arguably contradictory passages of a statute for which the intent of the legislature is clear but the envisioned implementation is "somewhat faulty." *Atwell v. Merit Systems Protection Board,* 670 F.2d 272, 286 (D.C.Cir.1981). Thus, the question of when the consultation and cooperation requirements of section 117 apply to the MRS siting process must be considered in light of the expressed purposes of the NWPA.

Congress clearly intended for the states to play an active role in the MRS siting process. The legislative history of the NWPA reflects a desire on the part of Congress to provide "public and state participation in the program to assure that the political and programmatic errors of our past experience will not be repeated." H.R.Rep. No. 491, 97th Cong., 1st Sess. 30, *reprinted in* 1982 *U.S.Code Cong. & Ad. News,* 3792, 3796. Although the primary legislative committee report does not mention state participation in MRS siting specifically,[46] it is clear that the level of state

---

**44.** *See* 42 U.S.C. § 10161(b)(2)(C) (1982) (twice referring to "congressional authorization"); 42 U.S.C. § 10161(c)(2) (1982) (requiring that a qualified environmental impact statement be prepared "[i]f the Congress by law ... specifically authorizes construction" of MRS). 42 U.S.C. § 10161(d) (1982) (stating that "any facility authorized pursuant to this section" shall be subject to the licensing requirements of 42 U.S.C. § 5842(2)); 42 U.S.C. § 10161(e) (1982) (stating that alternative facility designs for the temporary storage of nuclear waste could be considered in any environmental impact statement or licensing procedure of the NRC); 42 U.S.C. § 10161(f)(1) (1982) (requiring the Secretary to make financial impact aid available being informed of congressional authorization of the construction of an MRS facility).

**45.** *See id.*

**46.** The legislative history's section-by-section analysis of the NWPA states with respect to the MRS provision:

> Section 134 [section 141 of the Act] requires the Secretary to submit to Congress a proposal for construction of one or more storage facilities for civilian high level waste or spent fuel designed to store such fuel or waste for the foreseeable future. The section also sets out certain exemptions, licensing requirements and state assistance programs which would be applicable to a program to construct such a facility if such a program were ever authorized by Congress.

H.R.Rep. No. 491, 97th Cong., 1st Sess. 63, *reprinted in* 1982 *U.S.Code Cong. & Ad.News* 3792, 3829. The State ably chronicles the efforts made by Congress in 1982 to enact comprehensive nuclear waste legislation, focusing on the state participation requirements in various ver-

and public participation in the MRS siting process was intended by Congress to be no less than that accorded the states and public in the process of siting the permanent repositories. In offering an amendment to the reported House bill, Senator McClure added what is now subsection (h) of section 141, 42 U.S.C. § 10161(h), which makes the consultation and cooperation requirements of the repository siting process applicable to the MRS siting process. He explained the purpose of his amendment:

> Full state participation is provided for the MRS program in exactly the same way as it is provided in the case of repository sites.

128 Cong.Rec. S15,642 (1982) (daily ed. Dec. 20, 1982) (statement of Sen. McClure). Similarly, Senator Kasten stated that this and several other amendments to the pro-

posed bill would give states "a strong role in nuclear waste siting decisions." *Id.* at S15,668 (statement of Sen. Kasten). He further stated:

> The Department of Energy cannot be allowed to build a disposal facility without giving the states a meaningful role in the siting and construction decisions.
>
> A long-range nuclear waste disposal program is critical to our nation's energy future, and ... the proper role of States in the siting of disposal facilities is critical to the success of this program. The only successful nuclear waste disposal program will be one which matches national policy needs with local citizen concerns.

*Id.* Senator Jackson, referring to repositories, added that state participation and dis-

---

sions of the legislation. Arguing that its interpretation of section 141 is consistent with the legislative history of the NWPA, plaintiff describes the history of the participation requirements as follows:

> Prior to passage of the Act in its present form, both the House and the Senate of the 97th Congress passed separate and different versions of a comprehensive nuclear waste law. The Senate acted first with passage of S 1662 on April 29, 1982. [S 1662, 97th Cong., 1st Sess. (1982),] 128 Cong.Rec. S 4325 (Apr. 29, 1985). S 1662 provided for both a repository and an MRS. This initial version of the Senate bill left little doubt that a State affected by an MRS was to have the same rights as a repository state. Section 701(a) of the proposed legislation required the Secretary of DOE to identify within 90 days of the law's passage acceptable repository *and* MRS sites. *Id.* at 4334. Section 701(b) went on to provide that each state so identified for a repository or MRS
>
> ... shall have the right to participate in a process of consultation and concurrence, based on public health and safety and environmental concerns in *all stages* of the planning, siting, development, construction, operation, and closure of a *repository or a Monitored Retrievable Storage facility*....
>
> *Id.* (Emphasis supplied). Section 701(c) of S 1662 contained a provision similar to the present Act whereby the consultation and concurrence process could be reduced to a written agreement. *Id.*
>
> On December 6, 1982, the House passed its own version of a comprehensive high-level radioactive waste disposal act in H.R. 3809. This bill resembled very closely the current Act. Unlike S 1662, it treated the MRS and

repository in separate provisions. A provision for consultation and cooperation was included for states affected by a repository site. It was virtually identical to [section 117(b)] of the current Act, [42 U.S.C. § 10137(b)]. H.R. 3809, however, contained no provision requiring DOE to consult and cooperate with affected states in the MRS siting process. This shortcoming in the House version was eventually corrected.

> At the eleventh hour of the 97th Congress, a *third* version of a comprehensive nuclear waste law was introduced into the Senate as a "substitute" version of H.R. 3809. [S. 968, 97th Cong., 2d Sess., 128 Cong.Rec. 15,621 (1982)]. It was this "substituted H.R. 3809" that was enacted as the current Act.

> . On the day that substituted H.R. 3809 was passed in the Senate, December 20, 1982, the bill also went to the House where, after brief debate, it was passed with the entire Senate amendments intact by a vote of 256 to 32. [H.R. 3809, 97th Cong., 2d Sess., 128 Cong. Rec. 10,524 (1982).] The President signed the legislation into law on January 9, 1983.

Plaintiff's Memorandum at 28–31 (footnotes omitted).

It should surprise no one that Congress has considered waste legislation for several years, and has examined the type of participation by the states which would be most efficient. Congress actually explored the concept of placing an absolute veto power in the hands of the states to be exercised in connection with the siting of an MRS facility within their jurisdiction. For an example of this, see *Nuclear Waste Facility Siting, 1979: Oversight Hearing Before the Subcomm. on Energy & the Environment of the House Comm. on Interior & Insular Affairs,* 96th Cong., 1st Sess. (1979).

approval requirements were inserted in the NWPA to address the concerns of states and citizens that shortcuts would not be taken, and that there would be a clear set of procedures for the DOE to follow in siting an MRS facility. *Id.* at S16,666 (statement of Sen. Jackson). With that general purpose in mind, the Court rejects the Secretary's argument that the state has no formal participation and disapproval rights until after Congress authorizes MRS construction.

The legislative history and the statutory language of the NWPA dictate the conclusion that the provisions incorporated in section 141(h) of the Act, 42 U.S.C. § 10161(h), must be given effect prior to Congressional authorization of MRS construction. This result is consistent with the goals the statute is attempting to achieve, while the Secretary's interpretation by contrast would frustrate the express will of Congress. Thus, the term "authorized" in section 141(h) must assume the meaning advanced by the State, referring to a facility "generally contemplated for study and development by the Secretary and presentation to Congress," rather than the narrow meaning advanced by the Secretary.[47] This interpretation of the statute also is supported by the legislative history of the Senate predecessor bill, which stated that states "should be entitled to the broadest possible rights and opportunities to participate in the development of the facilities.... The Committee expects this fundamental principle to govern any interpretation, including judicial interpretations...." S.Rep. No. 282, 97th Cong., 1st Sess. 28 (1981).

The interpretation also assures states of substantive rights in the MRS siting process and, the Court believes, achieves a measure of harmony between the repository provisions and the MRS provisions. *Compare Weinberger v. Hynson, Wescott & Dunning, Inc.,* 412 U.S. 609, 631–32, 93 S.Ct. 2469, 2484, 37 L.Ed.2d 207, 224 (1973); *United States v. Stauffer Chemical Co.,* 684 F.2d 1174, 1184 (6th Cir.1982), *aff'd,* 464 U.S. 165, 104 S.Ct. 575, 78 L.Ed.2d 388

(1984) (stating that a court should read and construe a statute as a whole and, if possible, give it a harmonius, comprehensive meaning).

If the provisions of section 141(h) were to take effect only after Congressional authorization of an MRS facility, the state's rights to participate in consultation and cooperation procedures with the DOE, to receive formal notice that a site had been identified within its borders, and to disapprove a proposed site would be rendered meaningless. Such a result not only would vitiate the expressed purposes of the NWPA, but also would breach the judicial goal of giving effect, if possible, to every part of a provision so that no part will be "inoperative or superfluous, void or insignificant." *Norfolk & Western Railway Co. v. United States,* 768 F.2d 373, 379 (D.C.Cir.1985). *See, e.g., In re Arnett,* 731 F.2d at 361 (citing *Jarecki v. Searle & Co.,* 367 U.S. 303, 307–08, 81 S.Ct. 1579, 1582–83 6 L.Ed.2d 859, 863 (1961) ).

### 3. *Declaratory Judgment*

▪ Because the Court has found that this action is justiciable and for the reasons of construction set forth herein, the Court issues a declaratory judgment that the provisions of section 141(h) of the Act, 42 U.S.C. § 10161(h), take effect prior to the time of congressional authorization of the construction of an MRS facility. Therefore, the Secretary is required to comply with the consultation and cooperation requirements of section 117 prior to Congressional authorization of MRS.

### B. *What*

▪ Except for their basic disagreement as to when the provisions of section 141(h) become applicable in the MRS siting process, the parties essentially agree that the requirements of section 117(b), 42 U.S.C. § 10137(b), govern the consultation and cooperation procedures between the state and

---

**47.** Plaintiff's Memorandum at 34.

the Secretary.[48] To the extent that the parties have not concurred, the Court must compare the repository provisions and examine the legislative intent to determine what portion of section 117 applies to the MRS siting process. This issue would be an apt illustration of Chief Justice Marshall's statement that "[w]here the mind labors to discover the design of the legislature, it seizes everything from which aid can be derived...." *United States v. Fisher,* 6 U.S. (2 Cranch) 358, 386, 2 L.Ed. 304 (1805), *quoted in Stauffer Chemical,* 684 F.2d at 1183. The Secretary's obligation to consult and cooperate with the state affected by the final repository siting process is triggered in one of two ways. First, these requirements arise upon designation by the President of a site for "site characterization."[49] Second, the consultation and cooperation requirements arise upon the written request of a state which has been identified as having a potentially acceptable site pursuant to section 116(a) of the Act.[50] Within sixty days after either of these "triggering" events occurs, the Secretary must attempt to enter into a binding written agreement with the state which at a minimum sets forth the procedures under which the information exchange and consultation and cooperation requirements of sections 117(a) and 117(b) shall be executed. This agreement must cover several broad areas specified in section 117(c)(1)–(11), including "resolving" state objections to planning and siting, negotiating the procedures by which the state may monitor the ongoing activities at the site, and working out the schedule for the State's review of each of the key events n the repository study process.

The Court finds that the application of the consultation and cooperation requirements of section 117(b) to MRS serves to achieve the NWPA's goals of involving the state in the MRS siting process. Since the process of siting an MRS facility does not involve "site characterization" as required by section 117(b), the consultation and cooperation requirements will arise upon the performance of "any" study of a site. Therefore, the Court issues a declaratory judgment that *any* study of an area within a state for a possible MRS site requires consultation and cooperation with the state under section 117(b), 42 U.S.C. § 10137(b). This conclusion, the Court believes, helps bring consistency and harmony to the statute.

## V.

### Summary Judgment

A. *Facts*

█ Applying these conclusions to the undisputed facts of the case, the Court must consider the merits of the State's motion for partial summary judgment, which is based on the theory that the Secretary has violated the notification and consultation and cooperation requirements of sections 116(a) and 117 of the Act, 42 U.S.C. §§ 10136(a) & 10137. In resolving a motion for summary judgment, the Court must determine whether the materials before the Court "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *SEC v. Blavin,* 760 F.2d 706, 710 (6th Cir.1985). The Court finds that summary judgment must be granted to the plaintiff.

In this action, the facts are undisputed and the law is clear. Section 116(a) of the Act, 42 U.S.C. § 10136(a), by incorporation in section 141(h), requires that the Secretary notify the Governor and legislature of

---

**48.** *See* Plaintiff's Memorandum at 19–24; *Monitored Retrievable Storage Submission to Congress,* DOE/RW, vol. 1, at 32–33 (Dec. 1985) (review copy).

**49.** 42 U.S.C. § 10137(b) (1982). Under the repository siting scheme, the Secretary recommends sites to the President, who decides whether to approve or disapprove such candidate sites for "site characterization." 42 U.S.C.

§ 10132(c) (1982). Site characterization includes an extensive study into the geologic condition of the candidate site. 42 U.S.C. § 10101(21) (1982). Site characterization is conducted prior to the nomination of a site by the President to Congress.

**50.** *See* 42 U.S.C. § 10137(c)(2) (1982).

an affected state within ninety days of identifying potentially acceptable MRS sites within their jurisdiction. The Secretary failed to notify any Tennessee official that the siting studies were in progress. Although a violation of section 116(a) has occurred, no relief is necessary, because Tennessee now has constructive notice that it has been so identified.

Section 117(b) of the Act, 42 U.S.C. § 10137(b), by incorporation in section 141(h), requires the Secretary to "consult and cooperate" with the Governor and legislature "in performing any study" of a site for the purpose of determining whether that site is suitable for an MRS facility. The "Screening and Identification Study" [51] prepared by the DOE clearly constitutes a "study" developed "for the purpose of determining the suitability" of a site. *See* 42 U.S.C. § 10137(b) (1982). The facts demonstrate that the Secretary made no effort whatsoever to consult and cooperate with the executive and legislative branches of the Tennessee government in conducting the study. Neither did the Secretary attempt to negotiate a binding written agreement with the state to effectuate the consultation and cooperation contemplated by section 117(b).

The Court renders a declaratory judgment that the defendant, in preparing the "Screening and Identification Study," violated section 117(b) of the Nuclear Waste Policy Act, 42 U.S.C. § 10137(b), by failing to cooperate and consult with the Governor and legislature of the State of Tennessee in its preparation. There being no material facts in dispute, the Court grants partial summary judgment on its first cause of action to the plaintiff.

## VI.

### Injunctive Relief

Having exercised its discretion in rendering a declaratory judgment on the construction of section 141(h) of the NWPA, 42 U.S.C. § 10161(h), and having declared illegal the Secretary's failure to consult and cooperate with the State of Tennessee pursuant to section 117(b) of the Act, 42 U.S.C. § 10137(b), the Court is empowered to grant "[f]urther necessary or proper relief" to effectuate the judgment. 28 U.S.C. § 2202 (1982). While this Court undoubtedly has the power to grant injunctive relief against the defendant, such relief does not appear to be necessary at this time. Absent proof or allegation that the Secretary will not abide by the declaratory judgment, the Court may assume that the defendant will proceed in good faith, and in a manner which is consistent with the declaratory judgment without the coercion of an injunction. *See, e.g., Poe v. Gerstein,* 417 U.S. 281, 94 S.Ct. 2247, 41 L.Ed.2d 70, (1974); *Bryant v. Blanton,* 463 F.Supp. 155, 157–58 (W.D.Tenn.1979). This result, however, in no way affects the State's right to seek additional relief if it should become apparent at a later time that the Secretary plans to proceed with the MRS proposal in its present form [52] in disregard of the declaratory judgment.

It is so ORDERED.

### ORDER

In accordance with the accompanying Memorandum, the Court issues a declaratory judgment that the provisions of section 141(h) of the Nuclear Waste Policy Act, 42 U.S.C. § 10161(h), take effect prior to the time of congressional authorization of construction of an MRS facility. The Court also grants a declaratory judgment that any study of an area within a state for a possible MRS site requires consultation and cooperation with the state under section 117(b) of the Act, 42 U.S.C. § 10137(b).

Furthermore, the Court renders a declaratory judgment that the defendant, in preparing the "Screening and Identification

---

**51.** *See Screening and Identification of Sites For a Proposed Monitored Retrievable Storage Facility,* DOE/RW 0023 (Apr. 1985) (Plaintiff's Exhibit D; Defendant's Exhibit C).

**52.** *See Monitored Retrievable Storage Submission to Congress,* DOE/RW (review copy) (Dec. 1985) (Plaintiff's Exhibit J).

Study," [1] violated section 117(b) of the Act, 42 U.S.C. § 10137(b), by failing to consult and cooperate with the Governor and legislature of the State of Tennessee. Accordingly, the Court grants summary judgment to the State of Tennessee on its first cause of action.

1. *See Screening and Identification of Sites For a Proposed Monitored Retrievable Storage Facility,* DOE/RW 0023 (Apr. 1985) (Plaintiff's Exhibit D; Defendant's Exhibit C).