**STATE OF TENNESSEE, Plaintiff-Appellee (Nos. 86–5087, 86–5168), Petitioner (No. 85–3859),**

v.

**John HERRINGTON, Secretary of Energy, Defendant-Appellant (Nos. 86–5087, 86–5168), Respondent (No. 85–3859).**

**Nos. 85–3859, 86–5087 and 86–5168.**

United States Court of Appeals, Sixth Circuit.

Argued July 24, 1986.

Decided Nov. 25, 1986.

Rehearing and Rehearing En Banc Denied Dec. 31, 1986.

---

W.J. Michael Cody, Atty. Gen., John Knox Walkup, Chief Deputy Atty. Gen., Frank J. Scanlon (argued), Deputy Atty. Gen., Nashville, Tenn., for State of Tenn.

Alan Bates, Natural Rights Center, Summertown, Tenn., amicus curiae.

J. Carol Williams, Dept. of Justice, Washington, D.C., Dirk D. Snel, Glen D. Nager (argued), James C. Thomason, Asst. U.S. Atty., Nashville, Tenn., for Secretary of Energy.

Jay Silberg, Washington, D.C., for amicus curiae, Baltimore Gas & Elec. Co., et al.

Before KENNEDY and WELLFORD, Circuit Judges, and BROWN, Senior Circuit Judge.

CORNELIA G. KENNEDY, Circuit Judge.

This case presents for review two issues of statutory construction: (1) whether the federal courts of appeals have original jurisdiction to review the actions of the Secretary of Energy ("Secretary") regarding his compliance with the consultation and cooperation requirements of the Nuclear Waste Policy Act of 1982, 42 U.S.C. § 10101 *et seq.* ("NWPA" or "Act") with respect to Monitored Retrievable Storage ("MRS") facilities; and (2) whether the NWPA requires the Secretary to consult with any state before he sends Congress his proposal for the location and construction of one or more MRS facilities. We hold that the federal courts of appeals have original jurisdiction over actions involving the consultation and cooperation requirements applicable to MRS facilities under the NWPA. We further hold that the NWPA does not require the Secretary to consult with any state before he sends Congress his proposal for the location and construction of one or more MRS facilities. Accordingly, we reverse the District Court's holding that it had original jurisdiction and dismiss the petition for review of the Secretary's action.

## I. BACKGROUND

### A. The NWPA

The NWPA was passed by Congress and signed into law on January 7, 1983. The Act was designed to provide for the establishment of "programs for the development of repositories for the safe permanent disposal of high level nuclear waste and spent fuel, and to provide for the safe stabilization and long-term protection of sites for the disposal of low level radioactive waste." H.R.Rep. No. 491, Part I, 97th Cong., 2d Sess. 26, *reprinted in* 1982 U.S. Code Cong. & Ad.News 3792, 3792 [hereinafter cited as H.R.Rep. No. 491, *reprinted in* 1982 U.S.Code Cong. & Ad.News]. Title 42 U.S.C. § 10224(a) creates an Office of Civilian Radioactive Waste Management in the Department of Energy ("DOE" or "Department") to administer the Act. Section 10222 [1] establishes a Nuclear Waste Fund, funded by fees assessed the generators of the waste, to pay the costs of implementing the Act. This case is concerned only with Subchapter I of the Act, which deals with the actual disposal and storage of high-level radioactive waste, spent nuclear fuel and low-level radioactive waste.[2]

Subchapter I of the Act is divided into three parts. Part A authorizes and requires the DOE to construct a "permanent deep geologic disposal" facility or "repository" for high-level radioactive waste and spent nuclear fuel. 42 U.S.C. §§ 10101(18), 10131(b). Part B provides for an interim storage program for temporary storage of limited amounts of spent nuclear fuel. 42 U.S.C. §§ 10151, 10155(a), (e). Part C, which is the subject matter of this litigation, authorizes the Secretary to study the concept of MRS and to develop plans for MRS as an alternative plan for the long-term storage of nuclear waste in the event that Congress determines at a future date that such facilities are needed. The DOE is required to study the feasibility and practicality of constructing one or more MRS facilities and to submit a proposal to Congress detailing its findings. 42 U.S.C. § 10161. Although the construction of permanent repositories is automatically authorized by the NWPA, *see* 42 U.S.C. § 10131(b), Congress by law must explicitly authorize construction of an MRS facility. *See* 42 U.S.C. § 10161(b), (c)(2), (f).

The MRS system, if adopted by Congress, would serve as a "back-up" to the repository program. H.R.Rep. No. 491, *reprinted in* 1982 U.S.Code Cong. & Ad. News at 3810. As described in the Act, the purpose of MRS is:

> (A) to accommodate spent nuclear fuel and high-level radioactive waste resulting from civilian nuclear activities;
>
> (B) to permit continuous monitoring, management, and maintenance of such spent fuel and waste for the foreseeable future;
>
> (C) to provide for the ready retrieval of such spent fuel and waste for further processing or disposal; and
>
> (D) to safely store such spent fuel and waste as long as may be necessary by maintaining such facility through appropriate means, including any required replacement of such facility.

42 U.S.C. § 10161(b)(1). Section 10161 of the Act contains all of the express provisions relating to MRS. However, section 10161(h) also makes several of the sections and subsections of Part A of Subchapter I dealing with the participation of states and Indian tribes in the selection of sites for permanent repositories applicable to the MRS siting process.[3]

The NWPA provides that "[o]n or before June 1, 1985, the Secretary shall complete a detailed study of the need for and feasibility of, and shall submit to the Congress

---

1. All references to sections in this opinion are to sections of Title 42 of the U.S. Code.

2. Subchapter II of the Act deals with research, development and demonstration regarding disposal of high-level radioactive waste and spent nuclear fuel. Subchapter III sets forth various

administrative provisions relating to radioactive waste, such as provisions establishing the Nuclear Waste Fund and the Office of Civilian Radioactive Waste Management.

3. *See* footnote 7 *infra.*

a proposal for, the construction of one or more [MRS] facilities for high-level radioactive waste and spent nuclear fuel." 42 U.S.C. § 10161(b)(1). The Secretary is required to include certain items in his proposal, *see* 42 U.S.C. § 10161(b)(2) and (4), and he is required to consult with the Nuclear Regulatory Commission and the Environmental Protection Agency in formulating his proposal. 42 U.S.C. § 10161(b)(3).

**B. The Study**

Pursuant to the congressional directive in the NWPA, the DOE undertook a study of the feasibility of MRS as an option for the storage of spent nuclear fuel. This study resulted in a document entitled *The Need for and the Feasibility of Monitored Retrievable Storage—A Preliminary Analysis ("Need and Feasibility Analysis"),* which concluded that an MRS facility would significantly improve the overall operation of the nuclear waste management system.

The DOE then set out to identify potential sites for the MRS facility. After a lengthy study, which is described in a second report, *Screening and Identification of Sites for a Proposed Monitored Re-*

*treivable [sic] Storage Facility ("Screening and Identification Study"),*[4] the DOE determined that the preferred site was the Clinch River Breeder Reactor site, which is owned by the Tennessee Valley Authority. The DOE Oak Ridge Reservation and the Hartsville Nuclear Plant site were selected as alternatives. All three sites are located in the state of Tennessee ("the State").

On April 25, 1985, the director of the Office of Civilian Radioactive Waste Management of the DOE formally notified Tennessee Governor Lamar Alexander by letter that the DOE had completed its initial evaluation of potential MRS sites and that three candidate sites had been identified in Tennessee. The letter stated that the DOE's next step would be to complete evaluation of the sites and to prepare the proposal for submission to Congress on January 15, 1986. The letter also stated that the DOE intended "to provide Tennessee with funds, information and technical assistance to gain an understanding of the impacts of siting an MRS within its jurisdiction and, subsequently, to form independent opinions regarding MRS acceptability." Joint Appendix at 85.

---

**4.** The DOE used a multi-step process in selecting the preferred site for an MRS facility. The DOE first considered five factors in isolating the potential sites: (1) locations which would minimize total shipment miles; (2) the DOE's ability to judge the suitability of the site for development of a nuclear facility; (3) availability of sufficient acreage; (4) potential to compete with known land use, environmental or other public objectives; and (5) sites at which an MRS facility could be most successfully deployed.

The DOE initially looked at the first factor above and decided that an MRS facility should be located in the East-Central region of the United States. (The DOE's conclusions were reported in *Siting of an MRS Facility: Identification of a Geographic Region That Reduces Transportation Requirements.*) The DOE then applied the second factor, choosing to limit potential sites to lands owned by the DOE and used for nuclear activities or sites docketed with the Nuclear Regulatory Commission for development of production and utilization facilities. This resulted in the identification of 37 sites located in 12 states. The DOE then eliminated all sites which did not contain at least 1,100 available acres. This reduced the number of potential sites to 11 sites in 6 states. These sites were then analyzed with respect to eight factors:

(1) ease of regulatory compliance; (2) existing environmental setting; (3) geotechnical site characteristics; (4) socioeconomic setting and changes which might be induced by MRS development; (5) institutional and administrative structure of the state; (6) local transportation characteristics; (7) access to physical infrastructure (e.g., utilities); and (8) capital cost of construction.

*Screening and Identification Study* at 9. The DOE's evaluation was published in a three-volume report, *Monitored Retrievable Storage Facility Site Screening and Evaluation Report ("Screening and Evaluation Report").* The DOE concluded from this analysis that all 11 sites were acceptable. The DOE then tried to anticipate various problems that might arise with developing an MRS facility at each of the sites, including the potential for delay. Finally, DOE officials attempted to identify the sites at which they believed an MRS facility could most successfully be constructed. The DOE eliminated two sites from consideration and selected the three Tennessee sites as being the most preferable candidate sites. The DOE's final evaluations were set forth in the *Screening and Evaluation Report.*

The DOE announced its MRS proposal in the Federal Register the next day, stating that Tennessee was the preferred location for the facility. *See* 50 Fed.Reg. 16536, 16537 (1985). The announcement stated that copies of the *Screening and Identification Report* and the *Need and Feasibility Analysis* were available to the public and solicited public comment on the latter by July 1, 1985. The DOE also requested that states, affected Indian tribes and the public submit available information which might be useful in preparing the environmental assessments by July 1, 1985.

In the ten months between this announcement and the finalization of the DOE proposal in February, 1986, the DOE further analyzed the three selected sites. The DOE provided Tennessee with a $1.2 million grant to assist the State in its independent evaluation of the MRS system. On August 9, 1985, the State requested a 90–day review of the final MRS proposal. The DOE responded that it was unable to provide the materials 90 days before the scheduled submittal date of January 15, 1986, and that it wanted to avoid delaying the submission to Congress if at all possible. Submission of the DOE proposal was delayed from January 15 to February 6, and then to February 10, for other reasons, however. On January 21, 1986, the Governor announced the State's position on the MRS facility. The State's comments were officially transmitted to the DOE on February 5, 1986.

The DOE intended to submit its proposal and the State's comments to Congress on February 10, 1986. As a result of the litigation described below, however, this information has not yet been submitted.

### C. The Litigation

The State filed a complaint with the United States District Court for the Middle District of Tennessee on August 20, 1985, challenging the legality of the DOE's proposal for construction of an MRS facility in

Tennessee. The complaint requested, *inter alia,* a declaratory judgment that the DOE failed to follow the state "consultation and cooperation" process required under section 10137 of the Act in identifying Tennessee as a candidate for MRS facilities.[5] The State also requested that the District Court enjoin the DOE from presenting the proposal for an MRS to Congress absent compliance with section 10137. On October 22, 1985, the State filed a Motion for Partial Summary Judgment on this cause of action.

The DOE filed a Rule 12(b) Motion to Dismiss on October 21, 1985, arguing that the District Court lacked subject matter jurisdiction. The DOE argued that section 10139 of the NWPA vests exclusive and original jurisdiction in the United States courts of appeals over all matters arising under the Act. The State argued that the Act vests original jurisdiction over some disputes under the Act with the courts of appeals, but that this jurisdiction does not extend to disputes concerning development of an MRS under section 10161.

Following oral argument on November 12, 1985, the District Court ruled from the bench and denied the Motion to Dismiss. At the same time, the District Court authorized an immediate appeal of its ruling to this Court pursuant to 28 U.S.C. § 1292(b). The District Court entered a written Memorandum and Order on the jurisdictional issue on November 26, 1985. *Tennessee v. Herrington,* 622 F.Supp. 923 (M.D.Tenn. 1985) (denial of motion to dismiss). This Court granted the DOE's petition for permission to appeal on January 9, 1986.

Section 10139(c) of the Act requires that suits be filed with the court of appeals within 180 days of the action, or lack thereof, giving rise to the suit. To prevent the statute from running while the jurisdictional dispute was being resolved, the State filed a Complaint for Declaratory Judg-

---

5. The State also alleged certain constitutional deficiencies in the process described in the Act for the congressional approval of an MRS proposal submitted by DOE. The State did not move for summary judgment on this basis, nor did it seek any other type of ruling on this claim. Therefore, this issue is not before this Court.

ment and Injunctive Relief with this Court on October 18, 1985.

On February 5, 1986, on cross-motions for summary judgment, the District Court granted partial summary judgment to the State on Count One of its complaint. *Tennessee v. Herrington,* 626 F.Supp. 1345 (M.D.Tenn.1986). The District Court found that the language of section 10161(h), which incorporates section 10137 and its cooperation and consultation requirements, was ambiguous. The District Court agreed with the State that the Act was intended to require DOE consultation with the State before the proposal was submitted to Congress, not after congressional authorization as argued by the DOE. On February 7, 1986, the District Court granted a permanent injunction prohibiting the DOE from making any proposal to Congress or filing any documents with Congress which rely on siting studies developed prior to consultation and cooperation between the DOE and the State.

On February 25, 1986, this Court granted the DOE's motion to consolidate and expedite. Thus, the DOE's interlocutory appeal of the District Court's jurisdictional ruling (No. 86–5087), the State's original complaint in this Court for declaratory judgment and injunctive relief (No. 85–3859) and the DOE's appeal of the District Court's declaratory judgment and permanent injunction (No. 86–5168) were consolidated. On March 6, 1986, another panel of this Court denied the DOE's request for summary reversal of the District Court's declaratory judgment and permanent injunction. It also denied the DOE's request for a stay of the District Court's permanent injunction.

**6.** Section 10139(a) also makes actions arising under Subchapter II of the Act and review of certain environmental impact statements and environmental assessments subject to the jurisdiction of the courts of appeals. The only other explicit reference to judicial review in the NWPA is section 10201, which makes research and development activities under Subchapter II subject to the provisions of section 10139.

**7.** Section 10161(h) states:

## II. JURISDICTION

The first question that this Court must answer is whether the federal district courts or the federal courts of appeals have original jurisdiction over disputes arising under section 10161(h) of the NWPA. We find that the United States courts of appeals have such original jurisdiction.

The NWPA's provisions on judicial review are unclear. Section 10139(a) of the Act provides that the federal courts of appeals shall have original and exclusive jurisdiction over certain actions arising under the Act. This section states in relevant part:

(1) Except for review in the Supreme Court of the United States, the United States courts of appeals shall have original and exclusive jurisdiction over any civil action—

(A) for review of any final decision or action of the Secretary, the President, or the Commission under this part;
(B) alleging the failure of the Secretary, the President, or the Commission to make any decision, or take any action, required under this part ....

42 U.S.C. § 10139(a). Section 10139 is located in Subchapter I, Part A, of the Act. Facially, then, these subsections of section 10139(a) refer only to actions arising under Subchapter I, Part A. The provisions relating to MRS, on the other hand, are located in Subchapter I, Part C, of the Act.[6]

Section 10161(h), however, makes certain sections and subsections of Part A dealing with review of site selection and state and Indian tribe participation and consultation in the permanent repository context applicable to MRS facilities as well.[7] Section

Any facility authorized pursuant to this section shall be subject to the provisions of sections 10135 [dealing with review of repository site selection], 10136(a) [requiring notification of affected states and Indian tribes of potential sites], 10136(b) [requiring state participation in repository siting decisions], 10136(d) [requiring that the governor of the state be notified when Indian tribes are affected], 10137 [requiring consultation with states and affected Indian tribes], and 10138 [requir-

10161(h) does not expressly state that MRS facilities are subject to the jurisdictional provisions of section 10139(a). However, the provisions listed in section 10161(h) are subject to the original jurisdiction of the courts of appeals when they apply to permanent repositories.

The DOE argues that actions arising under section 10161(h), at least to the extent that the DOE's conduct is required because of the incorporation of sections found in Part A of the Act, are subject to the original jurisdiction of the courts of appeals in accordance with the provisions of section 10139(a). The State, on the other hand, argues that, since section 10139 is not specifically mentioned in section 10161(h), such actions are subject to the original jurisdiction of the district courts. The District Court examined this issue and concluded that it had original jurisdiction over matters arising under section 10161(h). *Tennessee*, 622 F.Supp. at 931. We disagree.

Because the statute is ambiguous on its face, we look to the relevant legislative history and the statutory structure as a whole to determine Congress' intent. We note first that the legislative history of the NWPA is silent as to Congress' intent regarding jurisdiction over matters arising under section 10161(h). However, the overall structure of the Act does reveal a consistent concern for timely implementation of the disposal provisions. For example, the Act requires federal agencies to submit a written report to the Secretary and to Congress explaining any failure to meet a project decision schedule for any repository. *See* 42 U.S.C. § 10134(e)(2). The Act directs federal officials to issue any authorizations necessary for the repository program "at the earliest practicable date." 42 U.S.C. § 10140(a)(1). The Act sets forth specific dates for repository site selection, 42 U.S.C. § 10134, completion of a mission plan scheduling major steps, 42 U.S.C.

§ 10221, and the initial acceptance of nuclear waste, 42 U.S.C. § 10222. The Act imposes a 180–day deadline for commencement of judicial review. 42 U.S.C. § 10139(c).

The Act and its legislative history reveal the same desire for timely completion of the MRS study and proposal. The NWPA as enacted is a compromise between the House and Senate bills. The House bill originally required development of an MRS proposal within five years of enactment of the statute. H.R. 3809, 97th Cong., 2d Sess. § 141(b) (1982). The Senate bill, on the other hand, would have required development of the proposal within one year after enactment. S. 1662, 97th Cong., 2d Sess. § 502 (1982). Congress compromised on a due date of two and one-half years.[8] 42 U.S.C. 10161(b). Senator Johnston explained the compromise as follows:

> If MRS is to become an alternative to the main program of irreversible geologic disposal of nuclear waste, we would at least like to know that the MRS approach will be "on the table" at approximately the same time the Nation is seriously considering specific geological disposal sites. This timing could become especially important if, for some unforeseen reason, the repository program runs into any snag. In this eventuality, we would want the option to be available to move to MRS; [sic] if only on an interim basis.

> To accomplish this it was essential that the House bill be amended. That bill provided that Congress would not even see the MRS proposal until 5 years after the enactment of the act—presumably in 1988. But this is well past the time when, under the provisions of the House bill, the commitment to a specific geological site would already be made.

128 Cong.Rec. 15664 (1982) (statement of Sen. Johnston).

ing participation of Indian tribes] of this title. For purposes of carrying out the provisions of this subsection, any reference in sections 10135 through 10138 of this title to a repository shall be considered to refer to a monitored retrievable storage facility.

**8.** The DOE has, of course, missed this deadline. That fact has no bearing on our interpretation of Congress' intent regarding judicial review, however.

Thus, Congress clearly intended that the development of the MRS proposal proceed in as timely a fashion as the development of the permanent repositories. Compared to the permanent repository process, the MRS proposal process has been streamlined in several ways. The site characterization process applicable to repositories, *see* 42 U.S.C. § 10133, does not apply to MRS. MRS sites do not require presidential review or recommendation as do permanent repositories. *See* 42 U.S.C. § 10132(c). Although section 10136(c) provides for financial assistance to states affected by the repository site selection process, section 10161(h) does not make this assistance available to states affected by the MRS siting process. Indeed, such states are entitled to impact assistance only after Congress has authorized construction of a facility within the state. 42 U.S.C. § 10161(f). Section 10134(f) requires that the Secretary prepare a final environmental impact statement to accompany any recommendation to the President to approve a permanent repository site. Section 10161(c)(1), on the other hand, requires that the Secretary prepare only an environmental assessment to submit to Congress with the MRS proposal. A full environmental impact statement is not required until after Congress has authorized construction of an MRS facility. 42 U.S.C. § 10161(c)(2). Section 10141(a) empowers the Administrator of the Environmental Protection Agency to promulgate specific regulations regarding permanent repositories; the Administrator has no such power over MRS facilities.

Finally, H.R.Rep. No. 491, *reprinted in* 1982 U.S.Code Cong. & Ad.News 3792, reveals Congress' desire that the development of an MRS proposal proceed with as much speed as the actual development of a final repository system. The Report states:

> The Committee notes that although there is substantial confidence that the repository development program represented by the Committee amendment will provide safe facilities in a timely manner, it is not possible to resolve all uncertainties or predict all obstacles. The potential for failure or serious delay in the program exists. Monitored Retrievable Storage may be required in the event of failure or long-term delay of the repository development program. Indeed, this need for insurance that some safe technology will be available when nuclear reactors begin being decommissioned is the Committee's primary basis for recommendation of the detailed planning for an MRS program included in the Committee amendment to H.R. 3809.

*Id.* at 3810. An MRS proposal cannot provide the back-up insurance desired by Congress unless it proceeds in the same timely fashion as the development of the permanent repository program. Accordingly, Congress must have intended the same jurisdictional provisions to apply to both permanent repositories and MRS, rather than allowing the MRS proposal to be delayed by lengthy, repetitive litigation.

Moreover, adoption of the State's position on jurisdiction would create an inconsistency in the application of the Act. The provisions listed in section 10161(h) are clearly subject to the original jurisdiction of the courts of appeals when they are being applied to repositories. The State's interpretation of the Act would permit both the district courts and the courts of appeals to review those actions when they are taken in connection with MRS facilities even though the Act clearly prohibits such duplicative review in the deep geological repository process. Since the Act evidences Congress' intent of timely implementation of all of its provisions, "such a seemingly irrational bifurcated system," *Crown Simpson Pulp Co. v. Costle*, 445 U.S. 193, 197, 100 S.Ct. 1093, 1095, 63 L.Ed.2d 312 (1980) (footnote omitted), should not be attributed to the Act absent clear congressional intent to the contrary. *See also Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 105 S.Ct. 1598, 1606, 84 L.Ed.2d 643 (1985) (quoting *Crown Simpson Pulp Co.*, 445 U.S. at 197, 100 S.Ct. at 1095). We find no such clear congressional intent here.

Although the issue of jurisdiction presented here is one of first impression, the Court of Appeals for the District of Columbia Circuit determined in an analogous case that original jurisdiction vested in the courts of appeals. *General Elec. Uranium Mgmt. Corp. v. United States Dept. of Energy,* 764 F.2d 896 (D.C.Cir. 1985) [hereinafter cited as *GEUMCO*], addressed the question of whether the courts of appeals or the district courts had original jurisdiction over lawsuits brought by power companies contesting fees assessed against them by the DOE under section 10222 of the NWPA. This section, a part of Subchapter III of the Act, creates a fund financed by nuclear power plants to pay for activities under the Act. Section 10139(a) does not explicitly apply to section 10222. Nonetheless, the Court of Appeals found that it had original and exclusive jurisdiction over actions arising out of section 10222.

In determining whether original jurisdiction lies in the courts of appeals, we must be governed by Congress' intent, "not by any views we may have about sound policy." *Florida Power & Light Co.,* 470 U.S. at 746, 105 S.Ct. at 1608 (citation omitted). Nonetheless, policy considerations are relevant in cases such as this where Congress' intent is ambiguous. *Cf. GEUMCO,* 764 F.2d at 903. We find the policy considerations relied upon by the *GEUMCO* Court in finding original jurisdiction in the courts of appeals over actions arising under section 10222 persuasive in the context of actions arising under section 10161(h) as well.

The *GEUMCO* Court noted first the general principle in administrative appeals that " 'where it is unclear whether review jurisdiction is in the district court or the court of appeals the ambiguity is resolved in favor of the latter.' " 764 F.2d at 903 (quoting *Denberg v. United States R.R. Retirement Bd.,* 696 F.2d 1193, 1197 (7th Cir.1983), *cert. denied,* 466 U.S. 926, 104 S.Ct. 1706, 80 L.Ed.2d 180 (1984)). The Court noted that vesting "exclusive jurisdiction in the court of appeals avoids duplicative review and the attendant delay and expense involved." 764 F.2d at 903 (footnote·omitted).

Second, the *GEUMCO* Court noted that that case did not require factual findings of a nature more suited to district court determination. We find the same to be true in the MRS siting process. The District Court found below that: "If original jurisdiction over MRS actions was vested in the court of appeals, the Court of Appeals for the Sixth Circuit would be compelled to hear proof in this case on the issue of whether or not the Secretary of Energy followed the proper statutory procedures in identifying sites in Tennessee as candidates for MRS installations." *Tennessee,* 622 F.Supp. at 931. The burden of developing this record is no greater than that posed by our having original jurisdiction in the siting process for permanent repositories. Since Congress saw fit to give us the responsibility in the one instance, we cannot conclude that the burden was too great for them to have intended in the other.

Finally, the GEUMCO Court noted that "original and exclusive jurisdiction in the courts of appeals promotes the congressional goals of efficiency and predictability" in dealing with the pressing national concern about the safe disposal of nuclear waste. 764 F.2d at 904. The Court found it "hard to believe that Congress intended to have any of the basic issues surrounding disposal of [spent nuclear fuel] to be tied up in duplicative litigation for years on end." *Id.* As the Court noted:

Nuclear reactors must be refuelled periodically at which time the [spent nuclear fuel] must be removed and stored. There is already a tremendous accumulation of [spent nuclear fuel] in short-term facilities with limited capacity. Consequently, nuclear facilities may well have to be shut down in the near future, and the matter of establishing safe and adequate disposal facilities is an acknowledged global problem of dramatic urgency.

*Id.* (footnote omitted). Given Congress' desire to develop a timely proposal for MRS as an alternative means for addressing the

problem of disposal of spent nuclear fuel and radioactive waste, we cannot conclude that Congress would have intended both the District Court and this Court to have jurisdiction over this matter.

Accordingly, we find that actions arising under section 10161(h) of the NWPA are subject to the judicial review provisions of section 10139.

## III. CONSULTATION AND COOPERATION REQUIREMENT

█ The NWPA poses a second question of statutory construction for this Court: when do the consultation and cooperation requirements of section 10137 take effect in the MRS siting process? We adopt the Secretary's interpretation of the Act and find that the consultation and cooperation requirements apply in the MRS setting only after congressional authorization of the proposal.

Section 10161(h) states: "Any facility authorized pursuant to this section shall be subject to the provisions of sections 10135, 10136(a), 10136(b), 10136(d), 10137, and 10138 of this title." Thus, this section attempts to incorporate most of the state participation requirements applicable to permanent repositories into the MRS siting process.[9] Section 10161(h) states that all references to "repository" in the incorporated sections are to be replaced by "MRS" for the purposes of this section. The key provision among those enumerated

in section 10161(h) for the purposes of this litigation is section 10137(b), which states:

> In performing any study of an area within a State for the purpose of determining the suitability of such area for a repository pursuant to section 10132(c) of this title, and in subsequently developing and loading [sic] any repository within such State, the Secretary shall consult and cooperate with the Governor and legislature of such State and the governing body of any affected Indian tribe in an effort to resolve the concerns of such State and any affected Indian tribe regarding the public health and safety, environmental, and economic impacts of any such repository. In carrying out his duties under this part, the Secretary shall take such concerns into account to the maximum extent feasible and as specified in written agreements entered into under subsection (c) of this section.

This provision creates the "consultation and cooperation" requirements at issue here.

By their language none of the provisions listed in section 10161(h), including section 10137(b), becomes applicable until the MRS facility has been "authorized." This litigation centers around the meaning of that term. The DOE argues that "authorized" in section 10161(h) means "authorized by Congress" so that the consultation and cooperation requirements of section 10137 do

---

**9.** A brief description of the permanent repository siting process is useful in understanding the following discussion. Section 10136(a) requires the DOE to identify, within 90 days of the passage of the NWPA (January 7, 1983), an unspecified number of "potentially acceptable" repository sites. Within 90 days thereafter, the DOE is required to notify the governor, the legislature and any affected Indian tribe in any state affected by the identification. 42 U.S.C. § 10136(a). The DOE must "nominate" 5 sites as suitable for a repository using certain guidelines. 42 U.S.C. § 10132(b). The DOE must then choose 3 "candidate" sites and submit them to the President for approval. 42 U.S.C. § 10132(b)(1)(B). The President must review the sites in accordance with 42 U.S.C. § 10132(c). If presidential approval is forthcoming, the sites will be subject to "site characterization" under 42 U.S.C. § 10133. Then the

DOE selects one of the 3 sites and recommends it for construction of the permanent repository. 42 U.S.C. § 10134(a). Unless the site is successfully challenged in Congress by the disapproval process described in §§ 10136(b) and 10135, the DOE is free to construct the repository.

The DOE has two separate obligations to consult and cooperate with an affected state in this process. Section 10137(b) requires the DOE, "[i]n performing any study of an area within a State for the purpose of determining the suitability of such area for a repository pursuant to section 10132(c)," to consult and cooperate with such state. Section 10137(c) requires the DOE to attempt to negotiate a consultation and cooperation agreement "[n]ot later than 60 days after (1) approval of a site for site characterization for such a repository under section 10132(c) ... or (2) the written request of the State ... notified under section 10136(a)...."

not apply until Congress has determined to go forward with the MRS program and has approved the construction of an MRS facility. The State, on the other hand, argues that "authorized" means a facility being studied by the DOE for presentation to Congress, so that consultation and cooperation must occur before congressional consideration and approval of the project. The District Court found that "[t]he legislative history and the statutory language of the NWPA dictate the conclusion that the provisions incorporated in section [10161(h)], must be given effect prior to Congressional authorization of MRS construction." *Tennessee*, 626 F.Supp. at 1359.

The Supreme Court stated in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984):

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82 (footnotes omitted).

Thus, we must look first to see if Congress' intent is clear. In general, the Court looks first to the language of the statute. If the meaning is clear, the Court must enforce the statute according to its terms. *Dickerson v. New Banner Institute, Inc.*, 460 U.S. 103, 110, 103 S.Ct. 986, 990, 74 L.Ed.2d 845, *reh'g denied*, 461 U.S. 911, 103 S.Ct. 1887, 76 L.Ed.2d 815 (1983); *United States v. Graham Mortgage Corp.*, 740 F.2d 414, 417 (6th Cir.1984).

However, as the District Court noted, the meaning of section 10161(h) is not clear, but rather is "susceptible to contradictory interpretations." *Tennessee*, 626 F.Supp. at 1357. Neither party's interpretation of "authorized" clearly effectuates congressional intent.[10] Therefore, we look to the legislative history and the overall structure of the Act.

The District Court correctly pointed out that the word "authorized" was used in six other instances in section 10161, and that in each case it referred to *congressional* authorization of an MRS facility. 626 F.Supp. at 1357. As the Supreme Court stated in *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985), "We should not lightly infer that Congress intended [a] term to have wholly different meanings in neighboring subsections." *Id.* 105 S.Ct. at 3281 (footnote omitted). Nonetheless, the District Court found that the legislative history of the NWPA indicated that Congress intended that the provisions incorporated in section 10161(h) apply before congressional authorization of construction of an MRS facility. 626 F.Supp. at 1359.

The legislative history of the NWPA does not reveal the meaning that Congress intended to give "authorized." The District Court discusses the legislative history supporting the State's contention that Con-

**10.** We note that a reading of the sections and subsections incorporated in section 10161(h) with the other provisions of section 10161(h) does not reveal Congress' intent. It is not possible, as section 10161(h) suggests, to simply insert "MRS" into every place where "repository" occurs in the listed provisions and get a logical result. For example, section 10135(b) provides that the designation of a site shall be effective

60 days after the President recommends the site under section 10134, unless the state submits a notice of disapproval in accordance with sections 10136 or 10138. Since section 10134 is not applicable to MRS facilities, the difficulties of adapting this section to the MRS proposal process are obvious. Neither party's interpretation of "authorized" will resolve this and other ambiguities in the Act.

gress intended that the states have a significant role in the development of an MRS proposal in detail. *See id.* at 1357–59. Thus, we need not repeat that discussion here, except to note that the legislative history does indeed provide some support for the State's contention that "authorized" means a facility being studied by the DOE for presentation to Congress.

However, we also note that the Act and its legislative history suggest that Congress had two conflicting goals: it wanted to provide the states with a meaningful role in the development of disposal facilities, but, as discussed in Part II *supra,* it also wanted to ensure the timely development of an MRS proposal. Adoption of the State's position would defeat the second goal, though it would further the first. The DOE's interpretation, on the other hand, would further the second goal, while impeding the first. In such an instance, we must adopt the DOE's position. As the Supreme Court noted in *Chevron, supra:*

> We have long recognized that considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer, and the principle of deference to administrative interpretations
>
> "has been consistently followed by this Court whenever decision as to the meaning or reach of a statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy in the given situation has depended upon more than ordinary knowledge respecting the matters subjected to agency regulations.
>
> "... If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned."

467 U.S. at 844–45, 104 S.Ct. at 2782–83 (citations and footnote omitted) (ellipses in

original). Moreover, the DOE's interpretation is a "contemporaneous construction" of the law by the agency " 'charged with the responsibility of setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new.' " *Aluminum Co. of America v. Central Lincoln Peoples' Utility Distr.,* 467 U.S. 380, 390, 104 S.Ct. 2472, 2480, 81 L.Ed.2d 301 (1984) (citation omitted). As such, it is entitled to deference.

The DOE's interpretation of "authorized" in section 10161(h) is a rational one. It does not totally deprive the State of its role in the MRS siting process, since the provisions set forth in section 10161(h) will apply when and if Congress approves the MRS proposal and authorizes construction of an MRS facility. Though the DOE's interpretation does give the State a more constricted role than the State would prefer, we cannot say that that role is clearly more limited than Congress had intended. Though there are arguments supporting the assertion that the states should have more input into the MRS siting process, we are mindful of the Supreme Court's statement in *Chevron, supra,* that: "When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail." 467 U.S. at 866, 104 S.Ct. at 2793. Accordingly, we uphold the DOE's interpretation of "authorized" in section 10161(h) as meaning "authorized by Congress." [11]

## IV.

Accordingly, we REVERSE the District Court holding that it had jurisdiction and further dismiss the petition for review of the Secretary's action.

WELLFORD, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge Kennedy's analysis concerning jurisdiction; this court has orig-

---

11. Because of our disposition of these issues, we need not reach the DOE's contention that a federal court may not constitutionally enjoin an agency from submitting information to Congress.

inal jurisdiction over actions concerning the issues here presented. *See General Elec. Uranium Management Corp. v. United States Dep't of Energy,* 764 F.2d 896, 904 (D.C.Cir.1985). Her statement of the background of the cases is a correct recitation; therefore, I have no problem with parts I and II of the decision and join in this discussion and disposition.

The Act's consultation and cooperation requirements [1] present a confused and complicated set of problems. As pointed out in footnote 9 of Judge Kennedy's decision, Section 10137(c) of the NWPA requires the DOE to attempt to negotiate a *consultation* and *cooperation* agreement "[n]ot later than 60 days after (1) the approval of a site for site characterization for such a repository under section 10132(c) [2] ... or (2) the written request of the State ... notified under section 10136(a).... " 42 U.S.C.A. § 10137(c). Here the DOE made no apparent attempt to negotiate a consultation and cooperation agreement on Tennessee sites before the Secretary recommended these sites for monitored retrievable storage (MRS) facilities.

The crux of the issue in the case is when the Secretary is to consult and cooperate with Tennessee officials after studying areas within Tennessee for determining the suitability of those areas as sites for an MRS facility. I agree with the district judge in this case that "inartful drafting of the NWPA makes a search for the answers" to the questions and issues involved "difficult." *State of Tennessee v. Herrington,* 626 F.Supp. 1345, 1356 (M.D.Tenn. 1986). I agree, furthermore, with Judge Wiseman that section 10161(h) "is susceptible to contradictory interpretations" and that it is "not unambiguous on its face."

*Id.* at 1357. We must therefore consider the meaning of that section in relation to section 10137(b) and the other applicable parts of the NWPA.

The meaning of "authorized" in section 10161(h) is a very serious bone of contention. Does it mean that consultation and cooperation with the States is to take place *after* or *before* an MRS facility site has been selected and "authorized" by Congress? It is difficult to gainsay the district court's rationale:

> If the provisions of section [10161(h)] were to take effect only after Congressional authorization of an MRS facility, the state's rights to participate in consultation and cooperation procedures with the DOE, to receive formal notice that a site had been identified within its borders, and to disapprove a proposed site would be rendered meaningless.

626 F.Supp. at 1359.

The majority adopts the Agency interpretation of the several provisions in controversy as "rational" and therefore controlling in view of the Act's inherent ambiguity. I am disposed, however, to the view that this interpretation, which allows the state to be consulted only *after* Congress has authorized the site, limits the state to such a restricted role that this interpretation is unreasonable and unacceptable in light of expressed legislative intent and other statutory language. Section 10137(b) is logically read as requiring the Secretary to consult and cooperate with Tennessee and its officials in the course of performing its full studies and appraisals and then considering candidates for MRS sites. This consultation and cooperation would take place before congressional authorization as the statutory scheme requires. The Act's

---

**1.** Section 10137(b) states:

In performing any study of an area within a State for the purpose of determining the suitability of such area for a repository pursuant to section 10132(c) of this title, and in subsequently developing and loading [sic] any repository within such State, the Secretary shall *consult* and *cooperate* with the Governor and legislature of such State and the governing body of any affected Indian tribe in an effort to resolve the concerns of such State and any affected Indian tribe regarding the public

health and safety, environmental, and economic impacts of any such repository. In carrying out his duties under this part, the Secretary shall take such concerns into account to the maximum extent feasible and as specified in written agreements entered into under subsection (c) of this section.
42 U.S.C.A. § 10137(b) (emphasis added).

**2.** Section 10132(c) provides for review of recommended candidate repository sites by the President. It does not refer to MRS facilities.

legislative history seems to make this the clear intendment of the prescribed procedures in order to give the states a meaningful and timely role in the site selection process. *See* 626 F.Supp. at 1357–59 (discussing the Act's legislative history). This goal, I believe, takes precedence over the goal of "timely development of an MRS proposal" as described by Judge Kennedy.

I therefore respectfully dissent from Part III of the majority opinion.

WELLFORD, Circuit Judge, dissenting.

Because of the exceptional importance of the issues presented in this case, I respectfully dissent from the order denying a rehearing *en banc*. The decision in this case not only resolves a serious dispute for the State of Tennessee in its efforts to protect its environment and citizens, but will have important ramifications for the whole process of selecting nuclear waste disposal sites in the United States. It represents the first appellate consideration of a substantial portion of the Nuclear Waste Policy Act.

For the reasons stated in my dissent, I disagree with the majority's determination that the Department of Energy's "consultation and cooperation" with a state need not take place until after that state has been selected for a monitored retrievable storage (MRS) facility. I recognize, however, that this is a close question, and I believe the full court should consider this important issue.